**Joseph Avery ROBINSON,
Petitioner–Appellant,**

v.

**John P. WHITLEY, Warden, Louisiana
State Penitentiary, Respondent–
Appellee.**

No. 90–4554.

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1993.

Rehearing Denied Oct. 8, 1993.

M. Sean Royall, Baker & Botts, Houston, TX (Court-appointed), for petitioner-appellant.

Charles Brandt, Lafayette, LA, for respondent-appellee.

Before DAVIS and DeMOSS, Circuit Judges, and ZAGEL[1], District Judge.

DeMOSS, Circuit Judge:

On April 23, 1984, a jury in Lafayette Parish, Louisiana, convicted Joseph Avery Robinson of aggravated rape. The trial judge sentenced Robinson to life in prison at hard labor, without benefit of parole, probation, or suspension of sentence. The Louisiana court of appeals for the third circuit affirmed his conviction on direct appeal, *State v. Robinson,* 480 So.2d 329 (La.App. 3rd Cir.1985), and the Louisiana supreme court denied writ without comment. *State v. Robinson,* 498 So.2d 13 (La.1986).

Robinson chose not to collaterally attack his conviction through the state system, but instead sought federal habeas corpus relief. Based on a magistrate's report, the district court denied relief, and we affirm.

BACKGROUND

In the early morning hours of September 30, 1980, between 4:30 and 5:00 a.m., Mr. Jackie Wallace was returning from work when he surprised a burglar in his home in Opelousas, Louisiana. Mr. Wallace chased the burglar across his front lawn and to the man's car. The burglar jumped into a blue Chevrolet, locked the doors and sped away. Mr. Wallace managed to record the license plate number of the car.

Inside, Mr. Wallace discovered his wife's pocket book on the kitchen table and the contents scattered about. As the Wallaces began to make an accounting of their belongings, they discovered that the only item missing was a pair of Mrs. Wallace's pantyhose, which she had left lying on the living room couch.

Wallace described the intruder as a black male, wearing a dark shirt and blue bandanna. The Wallaces' dog discovered in their yard a bundle of money amounting to $36. The bills were lying next to a bush, about four feet from where the intruder had exited

1. District Judge of the Northern District of Illinois sitting by designation.

the Wallaces' home. Mr. Wallace recalled that in the process of fleeing the house, the burglar was digging around in his pocket, apparently searching for his car keys.

In the meantime, Robinson accidentally drove his car into a ditch in front of the home of Mrs. Lutha Breaux. Mrs. Breaux testified that around 5:45 on the morning of September 30, Robinson came to her front door and asked for help in getting his car out of the ditch. Because her husband owned a small car, they were unable to render assistance. However, Mr. Roland Guidry, a neighbor of the Breauxs, pulled the car from the ditch at precisely 7 o'clock that morning.

Less than half a mile away, Mrs. Charlene Hoffpauir and her four-year-old son were alone in their trailer. Around 7:30 that morning, Mrs. Hoffpauir was in the process of dressing for work when her son came in and told her that a man wearing a mask was peering into a window of their home. A few moments later, Mrs. Hoffpauir heard the door to her trailer come ajar. As she walked towards the door, a man wearing a pantyhose mask and wielding a large knife confronted her.

The man threatened her with the knife and forced her into the bedroom of the trailer. He forced her to the floor, pulled her hands behind her back, and tied her wrists with pantyhose. Using her gown as a gag, he raped her in front of her child.

When he had finished, the man got up and walked around the trailer, briefly removing his mask. Mrs. Hoffpauir managed to get a partial look at her attacker's face. She also heard him rummaging through her jewelry box. When all became quiet, she arose, found her son, and went to the front door of her trailer and screamed for help. A few moments later, her sister-in-law, who lived nearby, ran to the trailer and cut the pantyhose from her wrists.

When the authorities arrived, Mrs. Hoffpauir described her attacker as a light skinned black male, about 5'5" tall, with a slim build, weighing approximately 110 to 120 pounds. She said he had a mustache, sideburns and possibly a beard. She said he was wearing light-colored jean pants and a dark checkered shirt.

The detectives at the scene discovered footprint impressions near the window through which the child had observed the man peering. A crime scene technician made plaster casts of the impressions.

Meanwhile, the Opelousas police department continued their investigation of the Wallace burglary. Using the license plate number provided from Mr. Wallace, they discovered that the car was registered to Robinson. Armed with this information, the police obtained a warrant for Robinson's arrest.

The police arrived at Robinson's sister's house around 10:30 that morning. They discovered Robinson's blue Chevrolet bearing the license number Wallace had provided. When Robinson exited the house, the police placed him under arrest and advised him of his rights.

Robinson matched both Mrs. Hoffpauir's and Mr. Wallace's descriptions. He was wearing a dark-colored plaid shirt and light-colored jean pants, and he was barefoot. Robinson explained that his tennis shoes had become full of mud and were in the washing machine. Robinson's brother-in-law retrieved Robinson's shoes from the washing machine and gave them to the police. The police discovered a blue bandanna in Robinson's car. Robinson also complained of losing $36.

On October 7, 1980, Robinson was charged with the aggravated rape of Charlene Hoffpauir. Ten days later, he escaped from police custody and fled to Houston, Texas. Once there, Robinson assumed the name of Cedric Shelton and committed several crimes for which he was arrested. Thereafter, Robinson was released from custody in Texas and returned to Louisiana on August 4, 1982. He was indicted for the aggravated rape of Mrs. Hoffpauir on August 31, 1982. His case went to trial on April 10, 1984.

At trial, Hoffpauir identified Robinson as her rapist. She also identified the shirt taken from Robinson upon his arrest as the shirt worn by her rapist. The prosecution further established that Robinson burglarized the Wallace's house, stealing only a pair

of pantyhose. It also proved that the hose stolen in the burglary were the same ones used to secure Mrs. Hoffpauir's wrists during her rape. The prosecution also proved that the plaster casts taken from the footprint impressions outside of the trailer matched perfectly with the tread and wear patterns of Robinson's shoes. The evidence further placed Robinson less than a half of a mile from Mrs. Hoffpauir's trailer only thirty minutes before the rape. Finally, the prosecution decimated Robinson's alleged "alibi."

Robinson's petition for federal habeas corpus relief alleges no less than twelve violations of his constitutional rights. Of the twelve, only two merit our discussion here. Robinson claims that the trial court denied him due process of law by erroneously admitting evidence of the Wallace burglary in the trial of the Hoffpauir rape. He also claims that the state violated his Sixth Amendment right to a speedy trial. We address these claims in turn.

*Other Crimes Evidence*

Robinson predicates his due process claim on an evidentiary ruling by the trial court. Preliminarily, Robinson must show the ruling to have been error under Louisiana state law. This he cannot do.

■■■ Louisiana law generally prohibits the admission of "other crimes" evidence, that is, evidence of criminal conduct uncharged in the subject indictment. *State v. Prieur*, 277 So.2d 126, 128 (La.1973). However, it has also recognized exceptions to this general rule. One such exception permits evidence of other crimes to be admitted when it is probative of a defendant's identity. *See State v. Davis*, 389 So.2d 71, 72–73 (La.1980). In other words, when the offense charged involves a system, such evidence is admissible to prove the continuity of offense. Another exception permits the admission of such evidence when it forms part of the *res gestae* of the charged offense. *Prieur*, 277 So.2d at 128.

Contrary to allegations contained in Robinson's brief, a careful review of the record reveals that the state sought to have evidence concerning the Wallace burglary admitted under both the system and *res gestae*

exceptions. And in further contrast with Robinson's characterizations, the record shows that the trial court admitted the "other crimes" evidence on both of these grounds.

Because we find the burglary evidence to be clearly admissible as *res gestae* evidence, we express no opinion as to its admissibility under the other exception. At the time of Robinson's trial, La.R.S. 15:447 provided in relevant part:

> *Res gestae* are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants.... What forms any part of the *res gestae* is always admissible in evidence.

La.R.S. 15:448 also provided:

> To constitute *res gestae* the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous action.

In *State v. Haarala*, 398 So.2d 1093, 1097 (La.1981) the Louisiana supreme court provided insight into the admission of *res gestae* evidence.

> The general prohibition against the use of other crimes evidence does not bar admission of criminal acts which are an inseparable part of the whole deed. [citation omitted] In Louisiana, such acts are denominated as part of the *res gestae* and admitted under the authority of La.R.S. 15:447–448. A very close connexity between the charged offense and the other crimes evidence sought to be introduced under the *res gestae* exception is required. [citation omitted] ... This Court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. [citations omitted] In such cases the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate

context of happenings near in time and place. [citation omitted]

*Id.*

In *State v. Edwards,* 406 So.2d 1331, 1350–51 (La.1981), the court provided further insight into the application of this exception. The court laid out the facts relevant to its discussion of this issue as follows:

Edwards and Kent had arrived at Sheppard's house, defendant suggesting 'let's go make a hit ... over there at this lady's house ...' The plan got off to a ragged start. The trio went first to a grocery store where defendant stole some wine. The three then went looking for a car so that they could go to the lady's house and steal her car. Two attempts at theft failed and the trio returned to Kent's house. Ultimately, the group made its way to the victim's residence on foot. After [stabbing the 78 year-old victim to death in her home], the three sped away from the scene with defendant at the wheel of the victim's car. As the robbery coincident with the murder had netted only a few 'odd bitty coins in a box,' defendant suggested another 'hustle.' Defendant, still driving the victim's car, followed another woman to LSU campus where he instructed Sheppard to snatch her purse. The potential victim saw Sheppard coming and he abandoned the plan. Still looking for another 'hustle,' defendant eventually parked across the street from the 7–11 where [the police's] appearance terminated the night's activities.

*Id.* After recognizing the general prohibition to the admission of other crime evidence and the *res gestae* exception, the court continued:

The murder of Mrs. Todd did not occur in a vacuum. As Michael Sheppard related, defendant suggested the criminal activity which culminated with the death of the victim. The theft of the victim's car can hardly be said to be unrelated to her death. Using the victim's car, defendant and his cohorts continued their night of criminal activity. The sequence of events did indeed form 'one continuous transaction' with the crime for which defendant was being tried [i.e. first degree murder]

and therefore were properly admitted under the *res gestae* exception to the prohibition against the introduction of other crimes evidence. As this court remarked in *State v. Curry,* 325 So.2d 598 at 602 (La.1976), '[w]ithout [such] evidence, the complete story of the crime [could] not be told.'

*Id.*

■ Adhering to the direction provided by these cases, we reach the following conclusions: First, it can hardly be said that the burglary of the Wallace house was unrelated to the rape of Mrs. Hoffpauir. The evidence established that the pair of hose stolen in the burglary formed the instrumentality of the rape. The evidence from the burglary was necessary to prove that it was Robinson who stole the pair of hose and used it in the rape.

Furthermore, the sequence of events relating to the burglary and its aftermath formed "one continuous transaction" with the crime of rape. For this, we rely upon the closeness in time and location between the burglary and the rape. The credible evidence revealed that the rape occurred only two and a half to three hours after the burglary. Furthermore, the Wallace home is only about thirteen miles from Mrs. Hoffpauir's trailer. Moreover, evidence unearthed in the investigation of Robinson's alibi *vis á vis* the burglary placed Robinson within a half mile or less of Mrs. Hoffpauir's trailer, thirty minutes before her rape.

Thus, we find that the state did not introduce the evidence of the burglary to prove Robinson's criminal propensities or that he is a bad man. Rather, the evidence had independent relevance as an integral part of the crime for which he was tried and convicted. We therefore conclude that the evidence was properly admitted as part of the *res gestae.* *See State v. Guillory,* 201 La. 52, 9 So.2d 450 (1942).

Since we have determined that no error occurred in the admission of this evidence, Robinson has no basis for any alleged due process violation. *See Banks v. McGougan,* 717 F.2d 186, 190 (5th Cir.1983). Thus, we do not reach the second level of habeas inquiry.

*Right to Speedy Trial*

■ Determining whether a defendant's Sixth Amendment right to a speedy trial has been violated requires a careful balancing of the four factors enunciated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors are: (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right, and (4) the prejudice to the defendant. In balancing these factors, the district court made several findings, ultimately concluding no violation to have occurred. We find the court's overall evaluation not to have been clearly erroneous. *Davis v. Puckett*, 857 F.2d 1035, 1041 (5th Cir.1988).

### (1) Length of Delay

■ This first factor serves as a "triggering mechanism." *Barker*, 407 U.S. at 530, 92 S.Ct. at 2191. If the length of delay reaches a threshold level regarded as "presumptively prejudicial," the court must make findings regarding the remaining three factors and balance all accordingly. *Id.* The relevant period of delay is that following accusation, either arrest or indictment, whichever occurs first. *Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). In this case, Robinson was arrested for the rape on October 7, 1980, and his trial began on April 12, 1984. The district court correctly found this delay of approximately forty-two and a half months to require examination of the remaining factors. This circuit generally requires a delay of one year to trigger speedy trial analysis. *Nelson v. Hargett*, 989 F.2d 847, 851 (5th Cir.1993).

■ The balancing of factors required by *Barker* emphasizes that the delay itself is merely presumptive and does not warrant an immediate conclusion that the defendant has been denied his Sixth Amendment right to a speedy trial. *United States v. Carter*, 603 F.2d 1204, 1207 (5th Cir.1979). His conduct must be weighed against that of the government. *Id.*

### (2) Reasons for the Delay

The district court found that the approximate twenty-three-month delay between Robinson's arrest and indictment was attributable to Robinson's escape from Louisiana and incarceration in Texas. It also found that the approximate nineteen-month delay between Robinson's indictment and trial was attributable to Robinson's repeated requests for continuances. Thus the court placed responsibility for the entire period of delay on Robinson. With some slight modification, we find the court's allocation of responsibility to be correct.

Our review of the record reveals that the state should bear some responsibility for the pre-indictment delay in Robinson's prosecution. Robinson escaped from Louisiana on October 17, 1980 and fled to Houston, Texas. There he assumed the name of Cedric Shelton. As Cedric Shelton, he engaged in a course of criminal conduct that ultimately landed him in Huntsville. He was incarcerated under his assumed name.

It was not until Louisiana authorities received a letter dated June 17, 1981 from the Staff Counsel for Inmates at Huntsville that they became aware of Robinson's incarceration in Texas. The Chief of Detectives from Lafayette Parish responded by letter dated June 22, 1981, that Robinson had charges for aggravated rape and robbery pending against him in that parish and that the case would proceed upon his return.

Given that Louisiana learned of Robinson's incarceration on June 17, 1981, there was an approximate seven-month delay before the state acted by placing a detainer on him on January 26, 1982. The Texas Department of Corrections released Robinson on August 4, 1982 due to the so-called overcrowded conditions of its facilities. He was immediately extradited to Louisiana and was indicted on August 31, 1982, for the rape charges. Thus, between June 17, 1981 and August 31, 1982, there was a fourteen-and-a-half-month delay during which the state was aware of Robinson's incarceration in Texas and failed to take steps to secure him for prosecution.

■ The Supreme Court has stated that a defendant does not lose his constitutional rights because he is incarcerated under a lawfully imposed sentence outside the jurisdiction seeking to prosecute him. *Smith v.*

*Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). Upon the accused's demand, the state seeking prosecution has a "constitutional duty to make a diligent, good-faith effort" to bring defendants incarcerated in other jurisdictions to trial. *Id.* at 383, 89 S.Ct. at 579.

■ Robinson complains that the state "neglected" to discharge its constitutional duty to secure him for trial. He does not, however, charge the state with a deliberate attempt to delay the trial. Indeed, the record would not support such a charge. If established, a deliberate delay by the state would weigh heavily against it under our analysis. *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192. In any event, we view the state's failure to act during the pre-indictment period as simple negligence on its part. And as the Supreme Court has instructed, a "neutral reason" such as negligence weighs less heavily against the state. *Id.*[2]

■ In all other respects, however, we agree with the district court's evaluation of this factor. The record reveals that Robinson was responsible for more than one-third (from October 7, 1980, until June 17, 1981) of the pre-indictment delay by virtue of his escape and subsequent incarceration as Cedric Shelton. It further indicates that Robinson was responsible for the approximate nineteen-and-a-half month period of post-indictment delay. Robinson repeatedly requested and was granted continuances of trial. This court said in *Nelson* that a defendant "will not be heard to complain of a lapse of time attributable to continuances he sought and received from the trial court." *Nelson,* 989 F.2d at 852. In such a situation, "the speedy trial clock is properly tolled." *Id.*

Thus, we wholeheartedly agree with the district court's weighing of this factor against Robinson, who should properly bear responsibility for the lion's share of delay.

### (3) Assertion of the Right

■ The third factor places the burden on the defendant to alert the government of his grievances. The assertion of the speedy trial right "is entitled strong evidentiary weight" under the *Barker* test. *Barker,* 407 U.S. at 532, 92 S.Ct. at 2192. The district court found that "there [wa]s no question that Robinson repeatedly asserted his rights" via several motions, a writ of mandamus, and a letter to the Lafayette Parish judge. Although the district court did not expressly say that it weighed this factor in Robinson's favor, to the extent it did, we consider its evaluation clearly erroneous.

As this court noted in *United States v. Palmer,* 537 F.2d 1287, 1288 (5th Cir.1976), *cert. denied,* 434 U.S. 1018, 98 S.Ct. 738, 54 L.Ed.2d 764 (1978), "the point at which the defendant asserts his right is important because it may reflect the seriousness of the personal prejudice he is experiencing." In this case, defendant waited almost twelve months after his arrest on October 7, 1980, before filing his first motion for a speedy trial on August 25, 1981. In *Palmer,* this court considered the defendant's silence during the twenty-two months before his indictment as a factor weighing against him. *Id.* at 1288; *see also United States v. Avalos,* 541 F.2d 1100, 1115 (5th Cir.1976). While Robinson did not remain silent during the whole of the pre-indictment period, he remained so for almost seventy percent of that time.

Furthermore, the record reveals that Robinson asserted his speedy trial right on eight separate occasions. Of these, five took place after Robinson was indicted. And it was during this post-indictment period that Robinson succeeded in having his trial continued on four separate occasions.[3] We consider these continuances to be indicative of the degree of seriousness with which Robinson asserted his right to a speedy trial.

---

**2.** Although we determine that the Louisiana authorities' failure to act may have been negligent, in weighing their conduct, we are mindful of the fact that it was Robinson's knowing and voluntary escape and incarceration as Cedric Shelton that created the circumstances which foreseeably resulted in this fourteen month delay.

**3.** The district court found that Robinson requested and was granted *five* continuances. We could find only four. Whether it is four or five really does not matter. There were a sufficient number from which we can conclude that Robinson was in no great hurry to get to trial.

Thus, simply because Robinson peppered the court with speedy trial motions does not mean that he did so out of an honest desire for a speedy trial. We consider Robinson's pre-indictment silence and post-indictment continuances to outweigh whatever weight would ordinarily be due his speedy trial assertions.

(4) Prejudice to the Defendant

The final *Barker* factor inquires into the degree of prejudice suffered by a defendant due to the delay in prosecution. The Supreme Court in *Doggett v. United States,* — U.S. —, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), has modified its analysis under this factor. In *Doggett,* the Court stated that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Id.* — U.S. at —, 112 S.Ct. at 2692. It pointed out that there are situations when "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify." *Id.* — U.S. at —, 112 S.Ct. at 2693. The Court in *Doggett* provided three hypotheticals to illustrate the role of presumptive prejudice.

The Court described three situations in which a defendant would have to show varying degrees of prejudice. *Id.* The defendant's degree of proof in each situation varies inversely with the government's degree of culpability for the delay. *Id.* Thus, in the first case, where the government was reasonably diligent in its efforts to bring the defendant to trial, the defendant must show "specific prejudice to his defense." *Id.* This is so, according to the Court, no matter how great the delay. *Id.* On the other hand, if the defendant can show that the government intentionally held back its prosecution in order to gain an impermissible tactical advantage, then the defendant would "present an overwhelming case for dismissal." *Id.*

"Official negligence" occupies the "middle ground," according to the Court. *Id.* When the government's conduct is neither diligent nor malicious but simply negligent, the court must perform yet another balancing to determine the weight to be accorded such negligence. *See Id.* This balancing requires the court to determine what portion of the delay is attributable to the government's negligence and whether this negligent delay is of such a duration that prejudice to the defendant should be presumed. *Id.* The weight given to the government's negligence varies directly with its protractedness and its consequent threat to the fairness of the accused's trial. *Id.*

■ Here, the district court correctly required Robinson to demonstrate prejudice. We have found that the government's negligence is, at most, responsible for fourteen months of the delay—just two months longer than the one-year benchmark that triggers the speedy trial inquiry under *Barker.* This delay is not even close to the eight-and-one-half year delay in *Doggett,* or the five-year delay in *United States v. Shell,* 974 F.2d 1035 (9th Cir.1992) (finding that the government failed to distinguish *Doggett* ). Therefore, although the government was not diligent in pursuing its prosecution against Robinson during this fourteen-month period, this delay was not so excessive so as to require the state to rebut the presumption of prejudice. *Doggett,* — U.S. at —, 112 S.Ct. at 2694.

■ We further find that Robinson must demonstrate concrete proof of his prejudice because of his responsibility for the lion's share of delay. "*Doggett* holds that we should presume prejudice only if the defendant isn't responsible for the delay." *United States v. Aguirre,* 994 F.2d 1454, 1457 (9th Cir.1993). As discussed above, Robinson is responsible for approximately two-thirds of the total delay. Any threat to the fairness of his trial occasioned by a delay in its commencement was obviously a risk Robinson was willing to take.

In light of the foregoing, we proceed with analysis of Robinson's prejudice proof. The Supreme Court has identified three ways of establishing such prejudice: (1) proof of oppressive pre-trial incarceration; (2) proof of anxiety and concern of the accused; and (3) proof of a possibility that the defense was impaired. 407 U.S. at 533, 92 S.Ct. at 2193. Robinson claimed to have suffered prejudice in several respects. The district court found

his claims to be wholly without merit. We agree.

Robinson claims that because of the delay in prosecution, his defense was impaired. He bases this claim on two grounds: (1) the loss of two "alibi witnesses," and (2) the loss of two items of physical evidence. With regard to the alibi witnesses, Robinson last spoke to both witnesses in the latter part of 1980. One of them was shot to death in May of 1982; the other cannot be located. No attempt to find them was made until February 2, 1984 when Robinson's counsel requested the Harris County District Clerk to subpoena them. Even assuming these individuals could have and would have provided exculpatory testimony, either Robinson or his attorney should have taken adequate steps to preserve their testimony for trial. *Davis,* 857 F.2d at 1041.

As for their testimony, Robinson claims that the witnesses would have corroborated the "alibi" he presented at trial. By the trial's end, however, the prosecution had managed to blow so many holes in Robinson's alibi that the only effect their testimony would have had would be to have transformed Robinson's alibi from an incredibly tall tale to just a tall one. The record reveals that Robinson's alibi was thoroughly destroyed by his own contradictory statements and the testimony of other witnesses, including Robinson's brother-in-law and a nun.

With regard to the lost physical evidence, shortly after the rape, Mrs. Hoffpauir submitted to a medical examination from which a rape kit was prepared. She also provided a description of her attacker to a police artist who prepared a composite drawing. The prosecution could locate neither the rape kit nor the drawing for Robinson's trial. Robinson obviously asserts that these items would have proved his innocence.

Robinson's assertions, however, are insupportable. They amount simply to general allegations and speculation. Robinson can offer no evidence of what the rape kit or composite drawing would have shown. Indeed, when considered in light of the other evidence establishing Robinson's guilt, it is more likely that this evidence would have been inculpatory.[4] We, therefore, find that Robinson is unable to establish that the loss of this evidence resulted in actual prejudice to his case. *United States v. Ballard,* 779 F.2d 287, 293 (5th Cir.1986); *See United States v. Huntley,* 976 F.2d 1287, 1291 (9th Cir.1992); *See United States v. Sherlock,* 962 F.2d 1349, 1354 (9th Cir.1989).

Thus we conclude that the district court correctly found Robinson's assertions of prejudice to be without merit. Although there is no question that Robinson was prejudiced in the trial of his case, our review of the record reveals that the prejudice was not due to any delay in his prosecution, but rather to his guilt.

■■■■■ Having evaluated the factors under the *Barker* balancing test, we conclude that the district court correctly determined the issue; Robinson has failed to establish any violation of his Sixth Amendment right to a speedy trial. Although the total delay was approximately forty-four months, it is Robinson who properly should bear responsibility for the greater part of the delay. And it is our belief that the Sixth Amendment does not permit a criminal to take advantage of a delay that his own conduct occasioned.

*Conclusion*

The judgment of the district court denying relief is AFFIRMED.

---

4. Robinson tries to make much of the fact that Mrs. Hoffpauir failed to identify Robinson in a lineup held shortly after her rape. Evidence contained in the record indicates that Hoffpauir was severely traumatized by the rape. Indeed, she went into hysterics at the lineup, ultimately having to be taken to the hospital. The evidence showed that Robinson was number six of six in the lineup. There is evidence that Mrs. Hoff-

pauir saw only five individuals at the lineup. She ultimately made a tentative identification by writing, "I think 5" on a piece of paper and signing her name. The piece of paper on which she wrote is in the record. Examination of this paper, specifically the manner in which she recorded her choice and signed her name, provides insight as to the degree of trauma under which she was suffering at that time.