*1565
AMENDED ORDER DENYING MOTION TO DISMISS

ROETTGER, Chief Judge.
THIS CAUSE is before the court following a hearing regarding defendant’s motion to dismiss the indictment on speedy trial grounds due to the six-year-plus delay be­tween indictment and defendant’s arrest. The court renders the following findings of fact and conclusions of law.
FINDINGS OF FACT
The indictment in this 1,100 kilograms co­caine smuggling case charging seventeen de­fendants was returned on December 2, 1986. Three of the defendants were Bahamians; the rest were Americans. Three defendants remain fugitives; another was recently ap­prehended and goes to trial next month. Twelve of the others, excluding Defendant Woods, pleaded guilty and were sentenced years ago. The indictment was unsealed on January 22, 1987.
Defendant, a Bahamian resident and offi­cial with the Bahamian government, entered the United States on June 2, 1993. His name was noticed in the Treasury Enforce­ment Communication System (TECS) when he cleared the American Immigration check­point at Nassau Airport. The American offi­cer called ahead to Immigration in Miami and he was taken into custody when he ar­rived.
Following defendant’s interdiction and ar­rest in the United States, defendant filed a motion to dismiss, largely relying on Doggett v. United States, — U.S. -, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The hearing for the presentation of evidence and argu­ment was held on defendant’s motion. De­fendant did not take the stand; however, his wife did.
Mrs. Woods testified they heard a rumor in 1986 that a Bahamian Customs officer had been indicted in the United States and read an article to that effect, but stated no Baha­mian names were mentioned in the article. She testified further that no official, Bahami­an or American, advised them of defendant’s indictment.
On cross-examination Mrs. Woods admit­ted the article identified the Bahamian Cus­toms’ officer as having been stationed at Chub Cay. She acknowledged that defen­dant was stationed there from 1983 to 1985. The indictment charges the criminal conduct occurred from May through June of 1985. The best evidence was that there were only four Customs officers in Chub Cay. Chub Cay is an island among the many in the Bahamas with a population of about 500 peo­ple. Chub Cay has an airstrip, a marina and a conclusion as to its population can be formed by the fact that its water is provided by a cistern which catches rain water[1].
Mrs. Woods was kind enough to make available her passports to the court and an examination revealed many trips to the Unit­ed States—she is a member of an interna­tional secretaries’ organization with several meetings in America. Additionally, there were various other trips, all with defendant: to Hong Kong and an Oriental country (name in oriental characters only) in 1986; New Zealand, Australia and Fiji in 1988 with a 30-­day extension of Visa, to Bermuda in 1989 and to the United Kingdom, France, Germa­ny and the Netherlands in 1990. She testi­fied that she made more trips to America than did defendant; their children were in college in the United States during this peri­od of time.
She stated she made $33,000 after-tax dol­lars a year working for Barclay’s Bank and that she did not know what defendant’s gov­ernment salary was. She further claimed that her husband went with her on the sever­al various trips they made and that she paid all expenses for their travels, including air­line tickets, hotel bills, meals and other ex­penses out of her earnings.
Mrs. Woods claimed that defendant did not seek special treatment because of his status as a Bahamian customs official. Customs officers in the Bahamas are part of the Min­istry of Finance and defendant has been with *1566 the Ministry of Finance for more than 20 years.
Interestingly, in 1988 the Bahamas brought a forfeiture action against some of defendant’s property and civil charges of liv­ing off drug proceeds. She claimed there was no mention of the American criminal proceedings in that action. The Magistrate in the Bahamas heard the evidence and ruled against defendant; however, for whatever reason, the appellate court reversed the rul­ing and entered judgment for defendant.
The forfeiture proceedings charged defen­dant in connection with two parcels of real property in a certain area, as well as proper­ty in Nassau East, three vehicles and large cash deposits in 1985, for example, $45,000. One of the lots cost $156,000. She paid cash for her Toyota. She clarified she did not go to see their Bahamian attorney, Longley, until 1988 when defendant got a summons for the forfeiture proceedings. Although the ex­act time of the conference was not clear, she made an appointment and talked with him about this article’s contents. Longley ad­vised them that they should wait and let the United States make the first move.
At the hearing defendant called a private investigator in an attempt to establish actual prejudice as to an alleged alibi, as follows: that a taped conversation alleged defendant had spent the night at a Howard Johnson’s Motel in Miami in 1985, but that his investi­gation at the hotel revealed that records more than five years old are destroyed as a matter of course. The government correctly asserts such records would not, by them­selves, establish an alibi.
Mrs. Woods described her husband’s pres­ent position as storekeeper with the Central Purchasing Department and that he had $15,000 in his bank account at the time of their marriage in 1972, that there were no infusions of money into their accounts be­cause of lottery winnings or inheritances, and that they maintain separate bank accounts. She does not know her husband’s current salary.
Evidence at the bond hearing revealed that Mrs. Woods and defendant had $78,000 in certificates of deposit and owned a house worth $150,000 with only a $50,000 outstand­ing mortgage balance on it, in addition to other real property worth $60,000.

EXTRADITION

Much effort was made to establish that there is an extradition treaty between the Bahamas and the United States. The treaty exists, it is. true. In the real world—particu­larly here in the trenches of the “point” both literally and militarily speaking of the ‘War on Drugs[2]”—one becomes somewhat cynical about the value of treaties as far as extradi­tion goes. Let me cite some personal obser­vations: in the ease of United States v. Thor Hansen, Case No. 81-6057-CR, before this court, the government charged the defendant with possession of cocaine with intent to dis­tribute; unfortunately, the defendant was free on bond. At the time of trial, the under­signed judge declared a morning recess. When the court reconvened after time for a cup of coffee, Defendant Hansen’s lawyer somewhat embarrassedly addressed the court to this effect: Judge, I don’t know where my client is. I went to make a phone call by the elevators; now he is gone and I can’t find him anywhere.
No one else could find Hansen in the Unit­ed States because he quickly flew the coop home to his native Norway. Extradition ef­forts were launched by the Department of Justice, but to no avail despite a treaty of extradition with Norway. The only reason this court could ever learn for the failure of Norway to extradite the defendant Hansen was simply that he was Norwegian. Some­one furnished the court several years later with newspaper clippings indicating that Thor Hansen is now the rock star of Scandi­navia.
*1567 More importantly and more recently, Co­lombia and the United States had treaties of extradition and a number of high-ranking members of the Colombian cocaine cartels were extradited to the United States, includ­ing reputedly one of the top three drug lords in Colombia, Carlos Lehder. Following the extradition of Lehder and a handful of other Colombians, Colombia announced it was no longer extraditing any Colombians under in­dictment in the United States to America for trial.
A Bahamian named Nigel Bowe, a lawyer in the Bahamas, but not a government offi­cial as Defendant Woods is, was sought by the United States for prosecution in the Southern District of Florida. Seven years later Nigel Bowe was finally extradited to the United States for trial and was recently convicted in this district. See United States v. Bowe, 841 F.Supp. 1160 (1993). Under one reading of Doggett, supra, the Bowe prosecution would already be on shaky ground because of the passage of seven years despite Nigel Bowe’s resistance at being ex­tradited. These examples, some occurring in the undersigned judge’s own courtroom (or immediately outside it) and the Colombian situation plus the Bowe extradition problems are so widely known in South Florida that the court can take judicial notice of them, cause this court to eye reliance upon extradi­tion treaties with extreme suspicion.[3]
The testimony at the hearing indicates that the Drug Enforcement Administration (“DEA”) did not attempt to extradite defen­dant Woods because the agency felt it would be a vain effort to try to extradite a Bahami­an official[4]. This conclusion was reached after discussion with the DEA liaison with the American Embassy in Nassau. There was evidence that Nassau officials were aware of the indictment charging Woods and of the warrant for his arrest[5]. The result in the Bahamian forfeiture case plus the extra­dition difficulties in the Bowe case hardly disabused the DEA of its conclusion,
The agents apparently thought they "were more likely to catch defendant at a border crossing as defendant’s name was P^ced in the National Crime Information Center (NCIC) shortly after indictment. The information was also logged into the TECS system used by Customs at border entries,

FAILURE TO DETECT DEFENDANT UPON HIS PREVIOUS ENTRIES INTO UNITED STATES

Between the time of the indictment in December of 1986 and his interdiction in June of 1993, defendant made 14 trips into the United States without his name causing an alert in the Customs TECS computer. Notably, defendant did not travel to the United States while he was defending Baha­mian charges of living off of drug proceeds and related forfeiture proceedings. He lost the case at trial. Defendant suspended trav­el until his case raising drug-related charges was reversed on appeal.
Defendant’s passports at all entries into the United States prior to his June 1993 entry had listed his occupation as Customs officer, even though his passport was re­newed in 1988 after he had left the Customs service and moved over to another branch of the Ministry of Finance. However, his pass­port was renewed again in May of 1993 and this time he was not listed as a Customs officer in his Bahamian passport; instead, he was merely listed as a clerk. Interestingly enough, on the first attempted entry into the United States after his passport no longer listed him as a Customs officer, Defendant Bursel Woods was arrested upon arrival in Miami.
*1568 CONCLUSIONS OF LAW
Defendant Woods moves to dismiss the indictment alleging his right to a speedy trial was violated since there was a delay of more than six years between the indictment’s re­turn and his arrest. The Sixth Amendment to the United States Constitution guarantees that “[i]n all criminal prosecutions, the ac­cused shall enjoy the right to a speedy and public trial ...” The Supreme Court set forth the relevant legal standard for making a speedy trial determination in Barker v. Wingo, 407 U.S. 514, 516, 92 S.Ct. 2182, 2185, 33 L.Ed.2d 101 (1972).
When assessing speedy trial viola­tion claims, courts must balance the following four factors: 1) the length of delay; 2) the reason for the delay; 3) defendant’s assertion of his speedy trial right; and 4) prejudice to defendant. Barker, 407 U.S. at 530-32, 92 S.Ct. at 2192-93. The four factors are relat­ed and must be considered together with all relevant facts. Id. at 533, 92 S.Ct. at 2193. The delay itself is merely presumptive and does not mean that a defendant has been denied his right to a speedy trial; the defen­dant’s conduct must be weighed against that of the government. Robinson v. Whitley, 2 F.3d 562, 568 (5th Cir.1993). The Supreme Court recently modified the Barker test by holding that a defendant does not always have to show particularized prejudice under the fourth prong to prevail on a constitution­al speedy trial claim. Doggett, — U.S. at -, 112 S.Ct. at 2693.

Length of Delay

In this case, the government con­cedes, and the court finds, that the six-year delay between the unsealing of the indict­ment and defendant’s arrest may be consid­ered “presumptively prejudicial” thereby triggering an inquiry into the other three factors under Barker.

Reason for Delay

The government likewise concedes its ef­forts to locate and apprehend Woods were “somewhat negligent” and that the “system failed” in this regard. It is not necessary for the government to exhaust all conceivable avenues for locating a defendant after indict­ment. United States v. Bagga, 782 F.2d 1541, 1543 (11th Cir.1986). Nonetheless, it must make a diligent, good-faith effort to find, apprehend and bring a defendant to trial. Id.; Smith v. Hooey, 393 U.S. 374, 383, 89 S.Ct. 575, 579, 21 L.Ed.2d 607 (1969).
At the hearing Sergeant Courtney testified he placed a phone call to defendant inquiring about the investigation involving Bahamian officers stationed at Chub Cay. In addition, federal agents registered defendant’s name and the pendency of his arrest warrant shortly after indictment in two nationwide crime information networks, NCIC and TECS. The government also contacted an official in the United States Embassy in Nas­sau and advised that Woods had been indict­ed.
The defendant claims the government’s ef­forts were grossly inadequate: Even though the agents knew he was employed by the Commonwealth of the Bahamas, they never contacted him to advise him of the indictment pending against him, sought his cooperation in coming to the United States to face the charges, or contacted his superiors at Cus­toms to inform them of the charges. The government never invoked the extradition treaty with the Bahamas even though defen­dant’s drug-related charges were contemplat­ed by the treaty. They failed to pursue the matter through diplomatic channels or through DEA agents in Nassau. Additional­ly, they did not check the NCIC and TECS data banks to see whether the information regarding defendant’s charges had been properly entered and maintained.
The government agents testified they viewed extradition of a Bahamian official for drug charges as futile. They already knew of the difficulty they were experiencing try­ing to extradite Nigel Bowe from the Baha­mas to the United States and Bowe was not a Bahamian official. The government believed it had a better chance of apprehending defen­dant without extradition. Significantly, the Eleventh Circuit does not require the gov­ernment “to pursue futile legal gestures” in its effort to bring a defendant to trial. See Bagga, 782 F.2d at 1543 (government’s fail­ure to seek defendant’s extradition from In­dia was no more than mere negligence where the offense charged in the indictment was *1569 not expressly covered by the applicable ex­tradition treaty).
The court finds there was no evidence the government deliberately delayed in order to hamper the defense. If established, deliber­ate delay would weigh heavily against the government. Barker, 407 U.S. at 531, 92 S.Ct. at 2192. A “neutral reason” such as negligence weighs less heavily against the government. Id. In this case the court concludes the government reasonably be­lieved it had a better chance of apprehending defendant at a border crossing.
Either the national databases were not working when the defendant travelled to the country or his name was not entered in the system[6]. The government agents surmised that defendant’s name was not entered as long as his passport listed his occupation as a customs officer. This speculation is borne out by the fact that he was nabbed on his first trip to the United States with a passport listing him as a clerk in the Ministry of Finance. The court finds defendant’s contin­ued use of the title “customs officer” contrib­uted to the delay. Since there was no evi­dence of bad faith on the government’s part, the court finds it acted somewhat negligently in apprehending the defendant.

Defendant’s Assertion of Speedy Trial Right

The government claims, however, that de­fendant is also at fault for not asserting his speedy trial right. The extent to which a defendant asserts his speedy trial right is critical to the overall question at issue. The Supreme Court has explained:
the defendant’s assertion of his speedy tri­al right, then, is entitled to strong eviden-­tiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.
Barker, 407 U.S. at 531, 92 S.Ct. at 2192. The Supreme Court has held that if a defen­dant is aware of his indictment prior to his arrest, this fact would weigh heavily against him. Doggett, — U.S. at -, 112 S.Ct. at 2691.
The defendant denies he knew of the charges and, therefore, could not have asked for a speedy trial. This denial is bolstered somewhat by his claim that he would not have visited the United States 15 times had he known there was an outstanding warrant for his arrest[7]. The Eleventh Circuit has explained that a defendant cannot be charged with a failure to request a speedy trial for the period before he learned of the indict­ment. Bagga, 782 F.2d at 1545; United States v. Dennard, 722 F.2d 1510, 1513 (11th Cir.1984).
However, the defendant and his wife have admitted they knew he might have been indicted in the United States. They heard rumors about such a ease and saw a Bahami­an newspaper article[8] in 1987 which stated that a Bahamian Customs official stationed at Chub Cay had been indicted on drug viola­tions. The defendant had even spoken by telephone to Sergeant Courtney of the Palm Beach Sheriffs Office who identified himself and asked questions about the vessel “The King and I” and certain persons involved in the charges. He asked defendant for identi­fication data.
In fact, the Woods were suspicious enough to contact an attorney who advised them to wait and let the United States make the first move. This same attorney represented de­fendant on Bahamian charges of living off drug proceeds and forfeiture charges. Mrs. Woods even asked her pastor to let her know if he learned anything about pending charges against Mr. Woods. The evidence unques­tionably demonstrates that they were aware *1570 of the investigation and indictment. But cf. United States v. Shell, 961 F.2d 138, 144 (defendant could not have known of sealed indictment), op. vnthdrawn, substituted op., on reh’g., 974 F.2d 1035 (9th Cir.1992); Williams, 782 F.2d at 1465-66 (defendant was unaware of the pending indictment).
Defendant insists he made a reasonable inquiry which failed to indicate that charges were pending against him. But defendant never directly contacted any United States law enforcement agency to confirm or allay his suspicions about pending charges. Un­like the defendant in Williams, he never requested an NCIC search for outstanding warrants. Id. at 1465 n. 1. While it is true he never concealed his identity, location or place of employment to elude discovery, at a minimum, he deliberately avoided learning whether there were charges against him.
In fact, the court finds the evidence dem­onstrates the Woods knew of the charges and merely waited, upon advice of counsel[9], to see if the United States government would lose interest in the case over time. The Speedy Trial Clause primarily protects those who assert their rights, not those who ac­quiesce in the delay hoping the government will change its mind or lose crucial evidence. Doggett, — U.S. at -, 112 S.Ct. at 2691. Central to the court’s finding is the fact that the court disbelieves much of Mrs. Woods’ testimony, especially her insistence they did not know her husband was a named defen­dant. Her assertion, in the face of her ad­mission defendant was one of only four cus­toms officials at tiny Chub Cay at the time in question and the newspaper article reported one was indicted, is at the most charitable, devoid of credibility.
Mrs. Woods’ testimony about key facts such as their finances, foreign travel and family income was contradictory and unwor­thy of belief. These glaring inconsistencies coupled with her admitted bias in the out­come, undermined the credibility of her en­tire testimony. Furthermore, her repeated assertion that they did not know defendant was named in the indictment is simply not believable unless they deliberately closed their eyes to what they had every reason to believe was fact.
The Woods admit they knew about an investigation and indictment for drug viola­tions in connection with Chub Cay during a time when he was one of only four customs officers stationed on a tiny island. They admit they read a newspaper article about the charges and that defendant spoke with a United States law enforcement officer about the matter. They were bombarded with so much local gossip about defendant’s involve­ment that they sought legal counsel on how best to proceed. Finally, defendant faced drug-related charges in his own country and can hardly now deny knowledge he was wanted by the United States authorities.

Prejudice

Finally, Defendant Woods claims the delay has prejudiced his case. The fourth Barker factor involves the degree of prejudice a defendant suffers due to delayed prosecution. The Supreme Court modified its analysis un­der this factor in Doggett holding that “affir­mative proof of particularized prejudice is not essential to every speedy trial claim.” Id. at -, 112 S.Ct. at 2692. There are instances when “excessive delay presump­tively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.” Id. at -, 112 S.Ct. at 2693.
When the government’s conduct is neither diligent nor malicious but simply somewhat negligent, as in the case at bar, the court must determine the weight to be accorded such negligence. Id. The court must decide what portion of the delay is attributable to the government’s negligence and whether this negligent delay is of such a duration that prejudice to defendant should be presumed. Id. The weight given to the government’s negligence varies directly with its protracted­ness and its consequent threat to the fairness of the accused’s trial. Id.
As previously stated, the delay in this case was six-and-one-half years rivalling the eight- and-one-half-year delay in Doggett that ne-­ *1571 eessitated the case’s dismissal. However, a defendant’s failure to assert his speedy trial right must also be considered in the preju­dice analysis. “Doggett holds that we should presume prejudice only if the defendant isn’t responsible for the delay.” United States v. Aguirre, 994 F.2d 1454, 1457 (9th Cir.1993).
Even if the court presumes prejudice, this presumption must be ■ balanced against the fact that defendant failed to assert his speedy trial right and that the government tried to apprehend him. The “point at which the defendant asserts his [speedy trial] right is important because it may reflect the seri­ousness of the prejudice he is experiencing.” United States v. Palmer, 537 F.2d 1287, 1288 (5th Cir.1976), cert. denied sub nom. Dilling­ham v. United States, 434 U.S. 1018, 98 S.Ct. 738, 54 L.Ed.2d 764 (1978); Robinson v. Whitley, 2 F.3d 562, 569 (5th Cir.1993). De­lay is a common defense tactic. Barker, 407 U.S. at 521, 92 S.Ct. at 2187.
Because Defendant Woods failed to assert his speedy trial right and was, therefore, jointly responsible for the delay, the court finds he must demonstrate proof of actual prejudice. Three harms may arise from a delayed trial: 1) oppressive pre-trial incar­ceration; 2) anxiety and concern of the ac­cused; and 3) the possibility that the defense will be impaired due to dimming memories and the loss of exculpatory evidence. Bark­er, 407 U.S. at 532, 92 S.Ct. at 2193. Defen­dant does not claim oppressive pretrial incar­ceration and there was no evidence he suf­fered anxiety and concern except that he thought he would not be prosecuted. See United States v. Beamon, 992 F.2d 1009, 1012 (9th Cir.1993); Hakeem v. Beyer, 990 F.2d 750, 762 (3d Cir.1993) (“[v]ague allega­tions of anxiety are insufficient to state a cognizable claim”). There has been no trial so defendant cannot point to particularized prejudice beyond a claim for lost evidence.
The charges are based, at least in part, on tape recordings of conversations in which he allegedly participated while staying at a Howard Johnson Hotel. Defendant claims prejudice as he cannot secure documents to show he was not a guest at the time the tapes were recorded since the hotel destroys all records after five years[10]. Defendant believes that other records he may need for his defense have also been destroyed and otherwise claims general prejudice due to the unnecessary post-indictment delay. The de­fendant has made no colorable showing of prejudice other than the destruction of hotel records whose value are speculative at best.
In this case, as in Aguirre, defendant knew about the charges and had every reason to prepare and preserve a defense. He deliber­ately sat back and waited for the government to make the first move. Defendant took the calculated risk as the years slipped by that, should he ever be apprehended, the fairness of his trial would be somewhat jeopardized due to the delay. The Ninth Circuit ac­knowledged that prejudice increases with the length of the delay but noted, that in situa­tions like these, the defendant, not the gov­ernment, is in the best position to arrest the clock and avert the damage. Id. at 1458.
CONCLUSION
In summary, the court finds defendant did not promptly assert his rights to a speedy trial which is entitled to strong evidentiary weight in the Barker analysis. Barker, 407 U.S. at 532, 92 S.Ct. at 2193. Furthermore, defendant has not shown prejudice while the government evidenced no dilatory purpose or bad faith in its efforts to apprehend him and bring him to trial. Despite the protracted delay between indictment and defendant’s ar­rest, the court holds defendant’s right to a speedy trial has not been violated.
This matter differs significantly from Dog-­gett; Doggett involved the government’s neg­ligent failure to prosecute a defendant living in the United States for a crime committed in this country. In addition, Doggett’s igno­rance of the charges lodged against him was unrebutted and was corroborated by testimo­ny of his wife, mother and cohorts. Appar­ently, Doggett was unaware of the charges and had no reason to prepare a defense. Such was not the case with Defendant Woods who decided to sit back and wait. The court is loathe to reward a fugitive for knowingly gambling with his speedy trial right. Ac­cordingly, it is
*1572 ORDERED AND ADJUDGED that de­fendant’s motion to dismiss is DENIED.
DONE AND ORDERED.

. Chub Cay is also one of two or three islands in the Bahamas well-known to the judges of this district as staging points or transfer points for cocaine shipments. See, e.g., United States v. Baptista-Rodriguez, 17 F.3d 1354 (11th Cir.­1994); United States v. Byrom, 910 F.2d 725 (11th Cir.1990).

. Past estimates by persons knowledgeable about the U.S. war on drugs indicate that 80 percent of the cocaine imported into America comes through this district. That estimate is certainly credible when one looks at the globe and realizes that Meridian 81 degrees West passes through Fort Lauderdale and Miami continues south to lie just off the western coast of South America, putting all of South America southeast of the United States. Consequently, Florida is the clos­est port of entry to all of the major cocaine source countries in Latin America: Colombia, Peru, Bolivia and Panama.

.With nearly 22 years as a judge of this court, the undersigned judge has undoubtedly tried more cocaine cases than any other active United States District Court Judge. If this judge does not have this dubious distinction among all U.S. District Court judges, it is undoubtedly Senior Judge King of this district. Senior Judge King recently presided over the trial of Nigel Bowe (see text above).

. The presentence reports prepared for other de­fendants in this case indicated, as late as August 15, 1989, that the government had requested extradition for Defendants Strachan, Mackey and Woods.

. One DEA agent witness had worked on the government's seven-year struggle to extradite Ni­gel Bowe.

. There was no evidence that defendant’s name was removed from the databases at any time. Contra United States v. Williams, 782 F.2d 1462, 1465 n. 1 (9th Cir.1985) (NCIC check at defen­dant’s request did not disclose outstanding war­rants where government had negligently re-. moved his name from the system.) Doggett, - U.S. at -, 112 S.Ct. at 2689 (defendant’s name vanished from the system when entry in TECS expired).

. The court notes, however, the defendant inex­plicably suspended travel to this country until his conviction for drug-related charges in the Baha­mas was reversed on appeal.

. Mrs. Woods testified they kept the article at the house for an indeterminate period of time but no longer have a copy and could not produce one for the court.

. One cannot help but note that Nigel Bowe's indictment issued in 1985 and the fact that the United States had been trying unsuccessfully to extradite Bowe for two years or so by the time the Woods met with attorney Longley.

. It may well be the government will acquiesce in such testimony, even by stipulation, at a trial.