KELLUM, Judge.
 

 Glenda LaFaye Jones was indicted for first-degree theft, a violation of § 13A-8-8, Ala.Code 1975. The trial court dismissed the indictment on the grounds that Jones was denied her constitutional right to a speedy trial. Pursuant to Rule 15.7, Ala. R.Crim. P., the State appeals the trial court’s judgment dismissing Jone’s indictment.
 

 Facts
 

 On April 20, 2006, Jones was arrested on charges of first-degree theft stemming from her involvement in an alleged embezzlement scheme in which more than $200,000 was stolen from her former place of employment, the Mobile Gas Service Corporation. Jones was indicted on the same charges more than two years later— on June 27, 2008. On October 8, 2008, Jones filed a motion to dismiss her indictment on the grounds that she had been denied a speedy trial. The trial court held a motion hearing on January 15, 2009; it granted Jones’s motion on April 8, 2009. This appeal ensued.
 

 Standard of Review
 

 “The facts before us are undisputed. The only question to be decided is a question of law, and our review therefore is de novo.”
 
 Ex parte Heard,
 
 999 So.2d 978, 980 (Ala.2003), citing
 
 Ex parte Key,
 
 890 So.2d 1056, 1059 (Ala.2003).
 

 Analysis
 

 In determining whether a defendant has been denied his constitutional right to a speedy trial, we apply the test established by the United States Supreme Court in
 
 Barker v. Wingo,
 
 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the following four factors are considered: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant’s assertion of his or her right to a speedy trial; and (4) the prejudice to the defendant.
 

 In
 
 Ex parte Walker,
 
 928 So.2d 259, 263 (Ala.2005), the Alabama Supreme Court stated:
 

 “ ‘A single factor is not necessarily determinative, because this is a “balancing test, in which the conduct of both the prosecution and the defense are weighed.” ’
 
 Ex parte Clopton,
 
 656 So.2d [1243] at 1245 [(Ala.1985)] (quoting
 
 Barker,
 
 407 U.S. at 530). We examine each factor in turn.”
 

 A.
 
 Length of the delay.
 
 Jones was arrested on April 20, 2006, and indicted on June 27, 2008; her trial was set to take place on November 4, 2008. The delay in this case was over 30 months.
 

 “In
 
 Doggett v. United States,
 
 the United States Supreme Court explained that the first factor — length of delay — ‘is actually a double enquiry.’ 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The first inquiry under this factor is whether the length of the delay is ‘ “presumptively prejudicial.” ’ 505 U.S. at 652, 112 S.Ct. 2686 (quoting
 
 Barker,
 
 407 U.S. at 530-31, 92 S.Ct. 2182). A finding that the length of delay is presumptively prejudicial ‘triggers’ an examination of the remaining three
 
 Barker
 
 factors. 505 U.S. at 652 n. 1, 112 S.Ct. 2686 (‘[A]s the term is used in this
 
 *647
 
 threshold context, “presumptive prejudice” does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the
 
 Barker
 
 enquiry.’).
 
 See also Roberson v. State,
 
 864 So.2d 379, 394 (Ala.Crim.App.2002).
 

 “In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant — whichever is earlier — to the date of the trial.’
 
 Roberson,
 
 864 So.2d at 394.
 
 Cf.
 
 § 15-3-7, Ala.Code 1975 (‘A prosecution may be commenced within the meaning of this chapter by finding an indictment, the issuing of a warrant or by binding over the offender.’); Rule 2.1, Ala. R.Crim. P. (‘All criminal proceedings shall be commenced either by indictment or by complaint.’).”
 

 Ex parte Walker,
 
 928 So.2d at 263-64.
 

 In the instant case, the more than 30-month delay was presumptively prejudicial.
 
 See State v. Van Wooten,
 
 952 So.2d 1176 (Ala.Crim.App.2006) (29-month delay was presumptively prejudicial);
 
 State v. Stovall,
 
 947 So.2d 1149 (Ala.Crim.App.2006) (41-month delay was presumptively prejudicial);
 
 Vincent v. State,
 
 607 So.2d 1290 (Ala.Crim.App.1992) (31-month delay was presumptively prejudicial).
 
 Cf. State v. Johnson,
 
 900 So.2d 482 (Ala.Crim.App.2004) (28-month delay was not presumptively prejudicial);
 
 Payne v. State,
 
 683 So.2d 440 (Ala.Crim.App.1995) (25-month delay was not presumptively prejudicial).
 

 B.
 
 Reasons for delay.
 
 The State conducted extensive investigation of the alleged embezzlement before indicting Jones on a charge of first-degree theft. The following dates, taken from the timeline created by the State, are helpful in analyzing this factor:
 
 [1]
 

 “February 10, 200k
 
 — [District attorney] subpoena issued to University of Alabama for [Jones’s] school records. [District attorney] subpoena issued to Spring Hill College for [Jones’s] school records.
 

 “February 12, 200k
 
 — [District attorney] subpoena and Court Order submitted to all 3 credit bureaus for [Jones’s] credit history.
 

 “March 9, 200k
 
 — [District Attorney’s] Office requested a player history check [for Jones] with the [Mississippi] Gaming Commission.
 

 “March 12, 200k
 
 — District attorney’s subpoena issued to Boomtown Casino for records.
 

 “February 3, 2005
 
 — [Assistant District Attorney] Martha Tierney contacted [United States Secret Service] for assistance [with] Criminal Investigation [regarding] Glenda LaFaye Jones; Meeting held Martha Tierney, Emmett Philyaw, Tom Impastato, [and] Tom Stiles in attendance; Philyaw presented [Microsoft] Excel spreadsheets which documented the fraud reported by Mobile Gas, approximately $244,196.13 had been embezzled. He explained the daily operations of receiving payments. Impastato faxed a request for a [Financial Crimes Enforcement Network] check on [Jones]. [District attorney] subpoena issued to AmSouth Bank for [Jones’s] bank records. [District attorney] subpoena issued to Chubb Group of Insurance Companies for records.
 

 
 *648
 

 “February k, 2005
 
 — Impastato obtained a company hard drive from Philyaw that was used by [Jones] which was forwarded to Birmingham for forensic examination. Impastato also interviewed Mobile Gas employee, Cheryl Weems. [District attorney] subpoena issued to KHEAA (Kentucky Higher Education Student Loan Corporation) for records. [District attorney] subpoena issued to Blue Flame Credit Union for records.
 

 “February 9, 2005
 
 — -Impastato interviewed Jennifer Farnell, Stephanie Anderson, Loretta Dixon, Veretressa Williams, and Robbie Moore (all former coworkers of Jones).
 

 “February 10, 2005
 
 — Report completed by Kimberly Owens on [Jones] for Im-pastato. AmSouth Bank responded to [District attorney]’s Subpoena Duces Te-cum that no account records located.
 

 “March 1, 2005
 
 — Impastato obtained written statements from Jennifer McIntyre (Jones’ supervisor), Veretressa Williams (coworker), and Stephanie Anderson (coworker). Impastato received/reviewed Mobile Gas time sheets for [Jones].
 

 “March lip, 2005
 
 — Kentucky Higher Education Student Loan Corporation submitted records to [District Attorney’s] Office via fax in response to subpoena issued.
 

 “April 12, 2005
 
 — Special Agent John Bailey in Birmingham conducted an examination of hard drive used by [Jones],
 

 “May 3, 2005
 
 — Forensic Report received by Impastato reported that no items of investigative interest were located on hard drive.
 

 “June 6, 2005
 
 — Impastato [and] Barbara Matt met [with] Emmett Philyaw to review Mobile Gas records.
 

 “June 7, 2005
 
 — Impastato [and] Barbara Matt met [with] Martha Tierney regarding all records [received] so far.
 

 “June 8, 2005
 
 — Impastato spoke to Aubrey Hill [with] KHEAA regarding records received [on March 15, 2005].
 

 “June 9, 2005
 
 — [Second district attorney] subpoena issued to KHEAA (Kentucky Higher Education Student Loan Corporation) for records.
 

 “July lip, 2005
 
 — Impastato contacted Boomtown Casino [and] Renee Meynier (Player’s Club/VIP Services Manager) provided a spreadsheet of all the gambling activity for [Jones]. Impastato provided Boomtown Casino information to Victor Henken [with] Mobile [Internal Revenue Service, criminal investigation division].
 

 “July 18, 2005
 
 — Impastato submitted spreadsheet from Boomtown Casino to [District Attorney’s] Office via e-mail.
 

 “July 21, 2005
 
 — Impastato contacted Investigator Dunn [with] Beau Rivage Casino for win/loss records regarding [Jones].
 

 “July 22, 2005
 
 — Impastato submitted spreadsheet from Beau Rivage to Victor Henken [with] Mobile IRS-CID.
 

 “August 10, 2005
 
 — [District attorney] subpoena issued to Ombudsman Office (William D. Ford Federal Direct Loan Program) for records.
 

 “August 15, 2005
 
 — Impastato contacted the Department of Education regional office in Chicago to request a subpoena location for records.
 

 “September 29, 2005
 
 — Impastato .contacted Emmett Philyaw to ascertain if he had reviewed the flowcharts created by Barbara Matt ... for accuracy. Phi-lyaw advised that he was unable to open the software to view the charts. Barbara Matt was contacted and she advised she would contact Philyaw and walk him through the procedure. Impas-tato met [with] Martha Tierney and re
 
 *649
 
 viewed the records from the Department of Education, Direct Loans section.
 

 “December 13, 2005
 
 — Impastato received final versions of the flow charts from Barbara Matt. The information was sent to Emmett Philyaw by Barbara Matt.
 

 “December 15, 2005
 
 — Impastato met [with] Emmett Philyaw and reviewed the information on the flowcharts.
 

 “December 21, 2005
 
 — Impastato sent Martha Tierney the final flowcharts via e-mail.
 

 “January 9, 2006
 
 — Impastato contacted ISD and requested a database check update on [Jones] and [L.F.] Check revealed new address for Jones in Atlanta area and Mobile address for [L.F.], Im-pastato contacted Special Agent Kellen-benz in [Atlanta] who conducted DL check on Jones, check negative.
 

 “January 11, 2006
 
 — Impastato requested ISD to run a Gateway check on Jones, check was negative. Impastato contact Martha Tierney to set up a meeting time to review flowcharts and determine a course of action for the [Jones] interview and prosecution, meeting scheduled for January 25, 2006.
 

 “January 25, 2006
 
 — Meeting held in [District Attorney]’s Office — Martha Ti-erney, Sharon Hill, Emmett Philyaw, and Impastato in attendance. Flowcharts reviewed and arrest warrant drafted. Impastato to attempt to verify a current location for Jones and once location was verified he would contact Sharon Hill to have the warrant sworn to by Emmett Philyaw. Once the warrant was issued Impastato and [District Attorney] Inv. Tom Stiles would then attempt to interview [Jones].
 

 “January 26, 2006
 
 — Impastato requested via e-mail for [Special Agent] Kellen-benz in [Atlanta] that a Special Agent be assigned to determine if [Jones] was residing in the [Atlanta] area. Special Agent Joey Ward was able to determine that [Jones] was residing at 511 Seasons Pkwy, Norcross GA, 30093 ([Atlanta] area).
 

 “April 11, 2006
 
 — Impastato contacted [Special Agent] Kellenbenz and advised that he and [District Attorney] Inv. Tom Stiles planned to travel to [Atlanta] on [April 19, 2006] in an attempt to interview [Jones] and asked the [Atlanta] office to reconfirm address.
 

 “April H, 2006
 
 — [Special Agent] Joey Ward rechecked the previous address and determined that [Jones] had moved to 377 West Wind Drive, Lilburn, GA 30047 ([Atlanta] area).
 

 “April 17, 2006
 
 — Emmett Philyaw [with] Mobile Gas swore to a warrant for the arrest of Glenda Jones for Theft of Property First.
 

 “April 20, 2006
 
 — Impastato, Tom Stiles, [Special Agent] Joey Ward ([Atlanta] agent), and [Special Agent] Mike Clark ([Atlanta] agent) located and interviewed Glenda Jones at her address. Prior to questioning Jones was advised of her rights via [explanation-of-rights form] which she [acknowledged] and waived by signing. [Said] form was witnessed by her common-law husband Clifton Prewitt who was present during interview. Jones provided [oral] statements when questioned, but refused to provide a written statement. Glenda Jones arrested on outstanding [Alabama] warrant which was served by Gwinnett County Police Department, [Jones] awaiting extradition to Mobile County, AL.
 

 “April 28, 2006
 
 — Glenda Jones was [extradited] to Mobile County and released on a bond. Preliminary Hearing set [for June 29, 2006] before Judge McKnight.
 

 “May 17, 2006
 
 — [District attorney] subpoena issued to Beau Rivage Casino for records.
 

 
 *650
 

 “May 18, 2006
 
 — Impastato met [with] Emmett Philyaw and reviewed Mobile Gas memorandum documents and spreadsheets detailing the accounting process used by Mobile Gas.
 

 “May 25, 2006
 
 — Martha Tierney contacted Impastato via phone to advise that she had contacted the [Alabama] Department of Revenue and requested their assistance in obtaining additional tax return information concerning Jones’ returns. Motion/Court Order submitted to Alabama Department of Revenue for the [defendant’s] state tax returns.
 

 “June 5, 2006
 
 — Impastato submitted a case report to Martha Tierney supporting the charge of [first-degree theft of property] against [Jones].
 

 “June 8, 2006
 
 — [District Attorney]’s Office received certified copies of Jones’ Alabama Tax Returns for the years 2002 through 2004 from the Alabama Department of Revenue. Emmett Philyaw sent Impastato an e-mail stating that [an investigator] went back and checked everyday and tied out the improper late cash — he also provided information regarding the Chubb Insurance (contact and claim [number]). Impastato emailed Barbara Matt [and] Martha Tier-ney the updated figures from Mobile Gas so that the flowcharts could be updated and also provided updated witness information for [Loomis Fargo & Co. and] Boomtown [Casino].
 

 “June 9, 2006
 
 — Martha [Tierney] sent an e-mail to Impastato asking if Jones’ girlfriend had been interviewed yet and to state that she would like for everyone (Impastato, Philyaw, [and] Emmanuel Roberts) to meet before the [preliminary hearing] date.
 

 “June 12, 2006
 
 — Martha [Tierney] sent a e-mail to Impastato stating that the [District Attorney]’s Office had copies of the [defendant’s] tax returns, which would be copied and sent to him. Martha also asked if someone from the [Secret Service] could analyze the tax returns, gambling records, and Mobile Gas records to determine the relationship between the dates [...].
 

 “June 21, 2006
 
 — Impastato [and] Phi-lyaw notified that [the date of Jones’s preliminary hearing] was reset from June 29, 2006 to June 20, 2006.
 

 “June 22, 2006
 
 — Impastato responded to [Martha Tierney’s] e-mails that he is still looking for the girlfriend, but has good leads and that he is checking [with] his headquarters about a forensic accountant, but does not think they will have one. Impastato and [Special Agent] Walden located/interviewed [L.F.] at her and her mother’s residence located 72 5th Avenue in Chickasaw, AL 36611. [L.F.] provided details concerning [Jones’s] habits, travel and gambling addiction during the time period of Jones’s employment at Mobile Gas. [L.F.] and Jones dated for a period time. Martha e-mailed that all gaming issues have been forwarded to Sharon Hill to review — to figure out what the file has, what is missing, and who the contact is to get the missing records.
 

 “July 11, 2006
 
 — Meeting held at Mobile Gas [with] Martha Tierney, Impastato, Emmett Philyaw, and Agent Robert McVay from the [Alabama] Department of Revenue in attendance to explain the investigation to McVay.
 

 “July Ik, 2006
 
 — Impastato and Agent McVay met [with] Deborah Lawrence, Marketing Manager at Boomtown Casino to review the spreadsheet of winnings that was provided by former casino employee Renee Meynier.
 

 “July 19, 2006
 
 — Robert McVay interviews employee at Boomtown regarding the gambling records submitted.
 

 
 *651
 

 “July 20, 2006
 
 — Glenda Jones’s [preliminary hearing] set — [Jones] waived her preliminary hearing.
 

 “January 9, 2007
 
 — Impastato discussed the case with Martha Tierney. He requested that the [District Attorney’s] Office issue subpoenas to the Porch Creek Indian Casino in Atmore, AL and SunTrust Service Center in Denver, CO.
 

 “January 11, 2007
 
 — [Second district attorney] Subpoena issued to Beau Rivage accompanied with Summoning Witness Packet.
 

 “January 12, 2007
 
 — [District Attorney’s] Office requested a [second] player history check with the [Mississippi] Gaming Commission.
 

 “January 16, 2007
 
 — [District attorney] Subpoenas issued to Belle of Orleans, Creek Entertainment Center, Grand Casino accompanied with Summoning Witness Packets.
 

 “January 19, 2007
 
 — [District attorney] subpoenas issued to Harrah’s New Orleans Casino and Imperial Palace accompanied with Summoning Witness Packets.
 

 “May 16, 2007
 
 — Martha Tierney contacted Impastato and advised that she was still waiting on records from the Beau Rivage Casino. She advised that she submitted all other gambling records to an expert witness. Bob Sertell for review and is [awaiting] his report before presenting the case to a grand jury.
 

 “May 21, 2007
 
 — [District attorney] subpoena and Summoning Witness packet faxed to Singletary [and] Thrash (counsel for [Imperial Palace] Casino).
 

 “July 27, 2007
 
 — Martha Tierney contacted Impastato and advised that she was still awaiting subpoenaed records and that Bob Sertell’s analysis/report were also still pending.
 

 “October 23, 2007
 
 — Martha Tierney sent Impastato an e-mail advising that a preliminary analysis by Bob Sertell had been conducted. Sertell had advised Ti-erney that additional W-2 information may be available from casinos.
 

 “November 26, 2007
 
 — Martha Tierney, Impastato, Tom Stiles, and expert Bob Sertell met at the [District Attorney’s] Office. Sertell reviewed all gambling records received with everyone present and advised additional information was still needed that should be maintained by the casinos.
 

 “November 27, 2007
 
 — Martha Tierney [and] Bob Sertell met again in [District Attorney’s] Office.
 

 “December 19, 2007
 
 — SBC sent Impasta-to an e-mail advising that the letters drafted by Martha Tierney for all the casinos in which the defendant played (per W-2s on tax returns) were ready to be served to the casinos.
 

 “January 16, 2008
 
 — Tom Stiles [and] Impastato met [with Mississippi] Gaming Commission Enforcement Agent Steve Roberts at the Beau Rivage Casino in Biloxi, MS and served VP and General Counsel Anthony Del Vescovo with an additional subpoena and a letter requested specific gaming records (items Bob Sertell said he needed). [Subpoenas] also served on Boomtown [and] Imperial Palace Casino, both located in Biloxi, MS.
 

 “January 22, 2008
 
 — [District Attorney] Investigator Tom Stiles [traveled] to New Orleans, LA and served [district attorney] subpoena and letter requesting specific records on Harrah’s Casino and attempted Belle of Orleans Casino (no longer in operation).
 

 “January 31, 2008
 
 — [Additional] records from Boomtown Casino received by [District Attorney’s] Office and copies mailed to Bob Sertell.
 

 
 *652
 

 “February 15, 2008
 
 — [District Attorney] Investigator Tom Stiles [traveled] to Creek Entertainment Center in Atmore, AL and served [district attorney] subpoena and letter requesting specific records.
 

 “March 13, 2008
 
 — Additional records received from Beau Rivage Casino [and] Grand Casino copied and mailed to Bob Sertell.
 

 “May 8, 2008
 
 — Impastato contacted Tom Stiles who advised the subpoenaed information was received and forwarded to gaming technical consultant, Robert [Sertell] and is being analyzed.
 

 “May 20, 2008
 
 — [District Attorney’s] Office sends Bob Sertell payroll records for defendant.
 

 “May 27, 2008
 
 — Martha Tierney and Bob Sertell discuss case over the telephone. [Second district attorney] subpoena issued to Blue Flame Credit Union for records.
 

 “June 13, 2008
 
 — Martha Tierney and Impastato met to discuss the status of the investigation and presentation of this case to a grand jury.
 

 “June 23, 2008
 
 — Case presented to June 2008 Grand Jury — Impastato testified.
 

 “June 27, 2008
 
 — June 2008 [Grand Jury] reported and returned a true bill for this case.
 

 “August 25, 2008
 
 — Defendant fails to appear in court.
 

 “September
 
 J,
 
 2008
 
 — Alias writ of arrest issued.
 

 “September 9, 2008
 
 — Alias writ of arrest is ordered withdrawn without action. Case reset for disposition on October 9, 2008, and trial on November 4, 2008.
 

 “October 9, 2008
 
 — [Defendant’s attorney] Jeff Deen filed Motion to Dismiss [on speedy-trial grounds] — motion will be heard on November 12, 2008.”
 
 [2]
 

 (C. 17-23.)
 

 In
 
 Ex parte Walker,
 
 supra, the Alabama Supreme Court stated:
 

 “The State has the burden of justifying the delay.
 
 See Barker,
 
 407 U.S. at 531;
 
 Steeley v. City of Gadsden, 533
 
 So.2d 671, 680 (Ala.Crim.App.1988).
 
 Barker
 
 recognizes three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay. 407 U.S. at 531. Courts assign different weight to different reasons for delay. Deliberate delay is “weighted heavily’ against the State. 407 U.S. at 531. Deliberate delay includes an ‘attempt to delay the trial in order to hamper the defense’ or “‘to gain some tactical advantage over (defendants) or to harass them.” ’ 407 U.S. at 531 & n. 32 (quoting
 
 United States v. Marion,
 
 404 U.S. 307, 325 (1971)). Negligent delay is weighted less heavily against the State than is deliberate delay.
 
 Barker,
 
 407 U.S. at 531;
 
 Ex parte Carrell,
 
 565 So.2d [104,] 108 [ (Ala.1990) ]. Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State.
 
 Barker,
 
 407 U.S. at 531;
 
 Zumbado v. State,
 
 615 So.2d 1223, 1234 (Ala.Crim.App.1993) (‘ “Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of
 
 Barker.’”)
 
 (quoting
 
 *653
 

 McCallum v. State,
 
 407 So.2d 865, 868 (Ala.Crim.App.1981)).”
 

 Ex parte Walker,
 
 928 So.2d at 265.
 

 In analyzing this prong of
 
 Barker,
 
 the trial court stated that there were “several significant unexplained gaps” that indicated a lack of diligence on the part of the State during the investigation. (R. 30.) However, the trial court’s written order does identify the specific dates of these unexplained gaps. The trial court attributed these gaps to official negligence and held that the negligible inaction “weighs significantly against the State.” (R. 80.)
 

 We have carefully examined the record. Our examination of the record indicates no deliberate delay by the State in an effort to prejudice Jones’s defense or to enhance its own case. Indeed, the timeline provided by the State and the testimony at the motion hearing demonstrates that the State undertook a complex investigation in attempting to gather circumstantial evidence with which it would be able to make its case against Jones. This investigation required the State to coordinate its efforts with the United States Secret Service and state law-enforcement officials in Mississippi, Georgia, and Louisiana. To find the necessary information it would use to build its case against Jones, the State had to request information from numerous state and federal departments, including the Mississippi Gaming Commission; the William D. Ford Federal Direct Loan Program; the United States Department of Education; and the Alabama Department of Forensic Sciences and Department of Revenue. The State also had to subpoena records from various banks and financial institutions, including AmSouth Bank, Blue Flame Credit Union, Kentucky Higher Education Student Loan Corporation, Chubb Insurance, and SunTrust Bank. Further, the State had to subpoena ree-ords from multiple casinos in Alabama, Mississippi, and Louisiana, including Boomtown Casino, Beau Rivage Casino, Porch Creek Indian Casino, Belle of Orleans, Creek Entertainment Center, Grand Casino, Harrah’s Casino in New Orleans, and the Imperial Palace Casino. In subpoenaing records from these casinos, the State explained:
 

 “The casino records were difficult to obtain for several reasons. One, is that after Hurricane Katrina, it took longer than usual to obtain responses from some casinos that had been severely damaged and/or were in the process of rebuilding, while a couple of the casinos had ceased to operate on the Mississippi coast entirely. Second, the casinos insisted that greater formality (use of the Uniform Act to Secure Attendance of Witnesses, etc.) accompany the subpoena process than had been previously required by these enterprises before the hurricane. Third, the casinos initially responded by giving incomplete information to the State and when the records were analyzed by the State’s expert, it was determined that under the laws of the various states, additional records were required to be kept by the casinos and these records were subpoenaed anew.”
 

 (C. 49.)
 

 The trial court’s determination that the delays in the State’s investigation should weigh significantly against the State does not reflect the proper weight this Court has assigned to delays cause by the State’s investigation. In
 
 Sharp v. State,
 
 [Ms. CR-05-2371 August 29, 2008] — So.3d(Ala.Crim.App.2008), this Court explained:
 

 “Some of the delay in this case was caused by neutral reasons that are not attributable to either the State or the appellant. The investigation was completed, forensic analysis was performed,
 
 *654
 
 psychological testing was done, discovery was conducted, and numerous evi-dentiary matters were resolved. Neutral reasons for delay do not ordinarily require a dismissal of the case based on a violation of the right to a speedy trial.
 
 See, Pierson v. State,
 
 677 So.2d 830, 831 (Ala.Crim.App.1996).”
 

 — So.3d at-.
 
 See also Kimberly v. State,
 
 501 So.2d 534, 537 (Ala.Crim.App.1986)(‘‘[N]egligence and ‘bureaucratic indifference and inefficiency’ must be weighed against the State, although not as heavily as a deliberate attempt to delay the trial.
 
 Taylor v. State,
 
 429 So.2d 1172, 1174 (Ala.Crim.App.),
 
 cert. denied, Alabama v. Taylor,
 
 464 U.S. 950, 104 S.Ct. 366, 78 L.Ed.2d 326 (1983).”).
 

 Although gaps do appear in the timeline created by the State, there is no evidence indicating that the State purposefully prolonged the investigation as a stalling tactic or as a means to hinder Jones’s defense. Like the delays in
 
 Sharp,
 
 the gaps in the State’s investigation reflecting delays appear to result from a neutral reason, and thus the delay is not attributable to either the State or the defendant. Even if we are to assume that the State was inefficient to the point of being negligent in its investigation, under
 
 Kimberly
 
 this negligence should be weighed against the State, but not as heavily as deliberate delay. Because the delay in this case was, at worst, negligent, any delays should be weighed against the State less heavily than had the delay been deliberate. Thus, although the second
 
 Barker
 
 factor weighs against the State, the precise weight of the State’s negligence and its effect on the prejudice to Jones will be addressed in our analysis of the fourth
 
 Barker
 
 factor.
 

 C.
 
 Assertion of right to speedy trial.
 
 Jones was arrested on charges of first-degree theft on April 20, 2006; she was indicted on June 27, 2008.
 
 [3]
 
 However, Jones did not file a motion to dismiss her indictment on speedy-trial grounds until October 9, 2008, less than one month before her trial was set to begin on November 4, 2008.
 

 “An accused does not waive the right to a speedy trial simply by failing to assert it.
 
 Barker,
 
 407 U.S. at 528, 92 S.Ct. 2182. Even so, courts applying the Barker factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, 92 S.Ct. 2182, and not every assertion of the right to a speedy trial is weighted equally.
 
 Compare Kelley v. State,
 
 568 So.2d 405, 410 (Ala.Crim.App.1990) (‘Repeated requests for a speedy trial weigh heavily in favor of an accused.’), with
 
 Clancy v. State,
 
 886 So.2d 166, 172 (Ala.Crim.App.2003) (weighting third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating: “‘The fact that the appellant did not assert his right to a speedy trial sooner ‘tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.’ ” ’) (quoting
 
 Benefield v. State,
 
 726 So.2d 286, 291 (Ala.Crim.App.1997), additional citations omitted), and
 
 Brown v. State,
 
 392 So.2d 1248, 1254 (Ala.Crim.App.1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial).”
 

 Ex parte Walker,
 
 928 So.2d at 265-66.
 

 The trial court found this factor to weigh against the State and in favor of Jones
 
 *655
 
 because, it said, Jones filed her motion to dismiss within seven weeks of being indicted.
 
 [4]
 
 The trial court explained that Jones became “accused” only once the grand jury returned the indictment against her on June 27, 2008. This, however, is an incorrect statement of law. The length of the delay in prosecuting a defendant begins from the date of the indictment or the date the defendant is arrested pursuant to a warrant, whichever event comes earlier.
 
 Roberson v. State,
 
 864 So.2d 379 (Ala.Crim.App.2002). Thus, the trial court should have considered the time between Jones’s initial arrest on April 20, 2006 and the filing of her motion on October 9, 2008, as the period during which Jones could have raised her speedy-trial concern. Given that Jones waited almost two years to assert her right, we can assume that Jones either acquiesced in the delays or suffered only minimal prejudice from the delay.
 

 D.
 
 Prejudice to the defendant.
 
 Jones contends that she was prejudiced by the more than 30-month delay for the following reasons: (1) the difficulty she would face in compiling the documents used to formulate her defense; (2) the difficulty she would face in locating and obtaining the presence of Larry Milton, an insurance adjuster who investigated her case; and (3) the emotional toll and anxiety she suffered during the time between her arrest and indictment.
 

 In
 
 Ex parte Walker,
 
 the Alabama Supreme Court discussed the general principles concerning prejudice and set forth guidelines regarding the interaction of the type and weight of prejudice with the cause of the delay, and explained how these two factors influenced the defendant’s burden of proving the fourth prong of
 
 Barker:
 

 “Because ‘pretrial delay is often both inevitable and wholly justifiable,’
 
 Doggett [v. United States],
 
 505 U.S. [647,] 656 [ (1992) ], the fourth
 
 Barker
 
 factor examines whether and to what extent the delay has prejudiced the defendant.
 
 Barker,
 
 407 U.S. at 532. The United States Supreme Court has recognized three types of harm that may result from depriving a defendant of the right to a speedy trial: ‘ “oppressive pretrial incarceration,” “anxiety and concern of the accused,” and “the possibility that the [accused’s] defense will be impaired” by dimming memories and loss of exculpatory evidence.’
 
 Doggett,
 
 505 U.S. at 654 (quoting
 
 Barker,
 
 407 U.S. at 532, and citing
 
 Smith v. Hooey,
 
 393 U.S. 374, 377-79 (1969);
 
 United States v. Ewell,
 
 383 U.S. 116, 120 (1966)). ‘Of these forms of prejudice, “the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.” ’ 505 U.S. at 654 (quoting
 
 Barker,
 
 407 U.S. at 532).
 

 [[Image here]]
 

 “The United States Supreme Court in
 
 Doggett
 
 used three hypothetical cases to demonstrate the accused’s burden under the fourth
 
 Barker
 
 factor. 505 U.S. at 656-57, 112 S.Ct. 2686.
 
 See Robinson v. Whitley, 2
 
 F.3d 562, 570 (5th Cir.1993) (discussing
 
 Doggett).
 
 The accused’s burden ‘of proof in each situation varies inversely with the [State]’s degree of culpability for the delay.’
 
 Robinson, 2
 
 F.3d at 570 (citing
 
 Doggett,
 
 505 U.S. at 656, 112 S.Ct. 2686). In the first scenar
 
 *656
 
 io, where the state pursues the accused ‘with reasonable diligence/ the delay— however long — generally is excused unless the accused demonstrates ‘specific prejudice to his defense.’
 
 Doggett,
 
 505 U.S. at 656, 112 S.Ct. 2686. Thus, when the state acts with reasonable diligence in bringing the defendant to trial, the defendant has the burden of proving prejudice caused by the delay.
 

 “[Discussion of the second situation recognized in
 
 Doggett
 
 involving bad-faith efforts by the state to delay the defendant’s trial.]
 

 “The third scenario recognized in
 
 Doggett
 
 involves delay caused by the state’s ‘official negligence.’
 
 Doggett,
 
 505 U.S. at 656-57, 112 S.Ct. 2686. Official negligence ‘occupies the middle ground’ between bad-faith delay and diligent prosecution.
 
 Id.
 
 In evaluating and weighing negligent delay, the court must ‘determine what portion of the delay is attributable to the [statej’s negligence and whether this negligent delay is of such a duration that prejudice to the defendant should be presumed.’
 
 Robinson,
 
 2 F.3d at 570 (citing
 
 Doggett,
 
 505 U.S. at 656-58, 112 S.Ct. 2686). The weight assigned to negligent delay ‘increases as the length of the delay increases.’
 
 United States v. Serna-Villarreal,
 
 352 F.3d 225, 232 (5th Cir.2003) (citing
 
 Doggett,
 
 505 U.S. at 656-57, 112 S.Ct. 2686). Negligent delay may be so lengthy — or the first three
 
 Barker
 
 factors may weigh so heavily in the accused’s favor — that the accused becomes entitled to a finding of presumed prejudice. 352 F.3d at 231 (citing
 
 Robinson,
 
 2 F.3d at 570, citing in turn
 
 Doggett,
 
 505 U.S. at 655, 112 S.Ct. 2686). When prejudice is presumed, the burden shifts to the state, which must then affirmatively show either that the delay is ‘extenuated, as by the defendant’s acquiescence,’ or ‘that the delay left [the defendant’s] ability to defend himself unimpaired.’
 
 Doggett,
 
 505 U.S. at 658 & n. 4, 112 S.Ct. 2686.”
 

 928 So.2d at 266-68.
 

 Under the fourth prong of
 
 Barker,
 
 the trial court presumed prejudice from the length of the delay suffered by Jones by including in its length-of-delay calculation the time elapsed from the conclusion of the theft in October 2003 until Jones’s arrest in April 2006. In rejecting the appellant’s argument that his four-and-one-half-year delay warranted a finding of presumed prejudice, the Alabama Supreme Court in
 
 Ex parte Walker
 
 explained:
 

 “The second reason for our refusal to presume prejudice under the fourth
 
 Barker
 
 factor relates to the recognition in
 
 Doggett
 
 that ‘to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.’ 505 U.S. at 657, 112 S.Ct. 2686. The Court concluded that ‘the Government’s egregious persistence in failing [for 8 1/2 years] to prosecute
 
 Doggett
 
 [was] clearly sufficient’ to entitle the accused to relief. 505 U.S. at 657, 112 S.Ct. 2686. The
 
 Doggett
 
 Court did not, however, establish a bright-line rule for the length of delay caused by governmental negligence that will warrant a finding of presumed prejudice under the fourth
 
 Barker
 
 factor. Even so, when an accused alleges solely that her trial was delayed because of governmental negligence — as is the case here — lower federal courts applying
 
 Doggett
 
 generally do not presume prejudice under the fourth
 
 Barker
 
 factor unless the post-indictment delay is five years or more.
 
 Sernar-Villarreal,
 
 352 F.3d at 232 (refusing to presume prejudice under the fourth
 
 Barker
 
 factor in a case in which prosecutorial negligence delayed the accused’s trial for
 
 *657
 
 three years and nine months and citing
 
 Doggett,
 
 505 U.S. at 658, 112 S.Ct. 2686 (presuming prejudice after six-year delay caused by the government’s negligence);
 
 United States v. Bergfeld,
 
 280 F.3d 486, 489-91 (5th Cir.2002) (presuming prejudice after a five-year-and-three-month delay caused by the government’s negligence, but noting that ‘[h]ad the delay been considerably shorter, [the accused] might well have been properly required to demonstrate prejudice’);
 
 United States v. Cardona,
 
 302 F.3d 494, 498-99 (5th Cir.2002) (presuming prejudice where governmental negligence resulted in a delay of more than five years);
 
 United States v. Brown,
 
 169 F.3d 344, 349-51 (6th Cir.1999) (presuming prejudice where governmental negligence resulted in 5 1/2-year delay);
 
 United States v. Shell,
 
 974 F.2d 1035, 1036 (9th Cir.1992) (presuming prejudice where governmental negligence resulted in a six-year delay)). Like the
 
 Doggett
 
 Court, we do not adopt a bright-line rule for the length of delay that will result in a finding of presumed prejudice. But we note that the four-year-and-two-month delay in Walker’s case is well within the five-year time period generally established by federal cases for presuming prejudice.
 

 928 So.2d at 269-70.
 

 The trial court erroneously included in its length-of-the-delay calculation the time elapsed between the alleged conclusion of the theft in October 2003 and Jones’s arrest in April 2006. As stated: “In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant— whichever is earlier — to the date of the trial.’ ”
 
 Ex parte Walker,
 
 928 So.2d at 263-64, quoting
 
 Roberson,
 
 864 So.2d at 394. Thus, only the time elapsed between Jones’s arrest in April 2006 and the tentative date of Jones’s trial in November 2008 — over 30 months — should have been considered. The trial court cited no relevant caselaw to support its finding that the time elapsed from the alleged termination of the theft in October 2003 to Jones’s arrest in April 2006 should be counted in calculating the length of the delay. Under the relevant caselaw, an over 30-month delay, taken by itself, does not warrant a finding of presumed prejudice. Thus, the trial court erred in determining that Jones was entitled to finding of presumed prejudice based solely upon the length of the delay.
 

 The trial court also found the that the delay inflicted actual prejudice upon Jones in three ways: (1) that the delay made it “next to impossible” for Jones to compile the necessary documents to prepare her defense (C. 33); (2) that the delay caused Jones to have great difficulty locating an allegedly key witness and compelling him to attend trial; and (3) that the delay took an “emotional toll” on Jones and caused great anxiety during the time between her arrest and the tentative trial date.
 

 The record indicates that Jones’s first claim regarding the difficulty in compiling the documents necessary to prepare her defense is without merit. At the motion hearing, the following exchange took place:
 

 “THE COURT: [Defense counsel], I guess I needed to just ask you, in trying to formulate a defense, have you had any barriers at this point because of the lapse in time that you’re aware of?
 

 “[Defense counsel]: As far as witnesses or documents?
 

 “THE COURT: Yes.
 

 “[Defense counsel]: I don’t have any other than this fellow in Texas. I’m assuming that the people that the state has talked to, it’s usually in a defense case, we don’t need as many, but I don’t
 
 *658
 
 think that it’s going to
 
 be
 
 — I
 
 can’t say there’s some record or something we don’t have.”
 

 (R. 99.) (Emphasis added.) The record indicates — and Jones does not contend otherwise — that the delay did not prevent her from compiling all the documents necessary to her defense. Accordingly, the trial court erred in finding actual prejudice on this ground.
 

 The trial court also found actual prejudice in Jones’s allegation that the delay made it more difficult for her to obtain the presence of a key defense witness. The witness in question was Larry Milton, an insurance adjuster who prepared a report for the Chubb Group, the insurance company that ultimately repaid the losses suffered by Mobile Gas, in which he concluded that Jones did not steal money from Mobile Gas. During the motion hearing, Jones explained that Milton resided in Plano, Texas, and that obtaining his presence at her trial in Alabama would be difficult. However, it appears that when defense counsel contacted Milton, Milton expressed his willingness to testify as a defense witness. Jones did not explain or allege how the delay frustrated or impeded her ability to obtain Milton’s presence for trial. Instead, Jones complained merely that it would be difficult to subpoena Milton in Texas because Jones “[would] have to go through that Uniform Compact Act to get him subpoenaed, which may or may not be a problem.” (R. 98.) Thus, the alleged prejudice appears in no way to be related to the delay attributable to the State’s actions, but rather is solely related to the statutory constraints Jones faced in formulating her defense strategy. Accordingly, the prejudice Jones faced is not attributable to the State’s actions and the trial court erred in finding any actual prejudice on this ground.
 

 With respect to Jones’s third claim regarding the anxiety she suffered due to the delay, the only evidence presented to support this contention is a letter written by Jones to the trial judge. In the letter, Jones detailed the personal issues she encountered during the pendency of the investigation, but pointed to only one instance of her taking action to inquire about her case. Jones explained that she went to the circuit clerk’s office to check on the status of her case. Other than this instance, there is no evidence indicating that Jones or her counsel contacted the district attorney’s office to inquire about her case or that Jones was being prejudiced by the delay in prosecution. Furthermore, Jones first raised a speedy-trial claim in her motion to dismiss, almost four months after she was indicted. The lack of inquiry and attempt to resolve the charges undermines Jones’s claim that the delay caused great anxiety and concern.
 
 Cf., Prince v. State,
 
 354 So.2d 1186, 1192 (Ala.Crim.App.1977)(“The fact that the appellant repeatedly and energetically inquired about the pending charges against him is a strong indication that the outstanding untried charge had a depressive effect on him.”). The record indicates that any prejudice Jones suffered as a result of anxiety or concern was slight and should not weigh heavily, if at all, against the State. Accordingly, under the fourth prong of
 
 Barker,
 
 the trial court erred in concluding that the length of the delay warranted a finding of presumed prejudice.
 

 Conclusion
 

 Pretrial delay certainly may be so lengthy as to relieve the accused of demonstrating actual prejudice,
 
 see Doggett v. United States,
 
 505 U.S. 647, 656-58, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). However, after applying the four
 
 Barker
 
 factors to the instant case, we conclude that the more than 30-month delay in Jones’s
 
 *659
 
 case has not crossed that threshold. Furthermore, with no presumed prejudice and minimal' — if any — actual prejudice in Jones’s case, the delay did not violate her right to a speedy trial.
 
 See, Doggett,
 
 505 U.S. at 656, 112 S.Ct. 2686 (“Our speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable.”);
 
 Barker,
 
 407 U.S. at 521, 92 S.Ct. 2182 (recognizing that delay in bringing an accused to trial does not always prejudice the accused);
 
 Serna-Villarreal,
 
 352 F.3d at 230 (“Obviously, in this balancing [of the
 
 Barker
 
 factors], the less prejudice [an accused] experiences, the less likely it is that a denial of a speedy trial right will be found.”). In balancing the four
 
 Barker
 
 factors, we cannot say that the delay in this case experienced by Jones prejudiced her to a degree that would warrant the dismissal of her indictment. Accordingly, the trial court erred in granting Jones’s motion to dismiss her indictment on speedy-trial grounds.
 

 Based on the foregoing, the judgment of the trial court is due to be, and is hereby, reversed and this case is remanded for the trial court to set aside its order dismissing the indictment and to restore Jones’s case to the active docket.
 

 REVERSED AND REMANDED.
 

 WISE, P.J., and WELCH, WINDOM, and MAIN, JJ., concur.
 

 [1]
 

 . The State prepared a timeline and attached it to its response to Jones's motion to dismiss. At the motion hearing, Jones agreed that the timeline was admissible as the correct statement of the dates in question. We now adopt the State’s timeline as a part of this opinion. (C. 17-23.)
 

 [2]
 

 . Although the State's timeline suggest that Jones was present for arraignment, the case-action summary indicates that Jones did not appear at arraignment. Thereafter, an alias writ of arrest for Jones was issued on September 4, 2008, but was ordered withdrawn on September 9, 2008. That same date, Jones was arraigned and the court reset Jones’s case for disposition on October 9, 2008, and for trial on November 4, 2008. (C. 2-3.)
 

 [3]
 

 . Although Jones’s motion to dismiss and the trial court's order states that she was indicted on August 25, 2008 (C. 6, 28), the case-action summary and the indictment indicate that Jones was indicted on June 27, 2008 (C. 2, 5.) The August 25, 2008 date appears to be the date Jones was scheduled for arraignment.
 

 [4]
 

 . The trial court’s calculation that only seven weeks passed between Jones’s indictment and her filing of the motion to dismiss was in error. As noted supra, Jones was indicted on June 27, 2008, and filed her motion to dismiss on October 9, 2008. Thus, Jones did not assert her right to a speedy trial until 15 weeks after being indicted, not 7, as the trail court stated.