



## MEMORANDUM OPINION

No. 04-09-00199-CR

Eulalio **HERNANDEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2003-CR-1009
Honorable Dick Alcala, Judge Presiding[1]

Opinion by:  Marialyn Barnard, Justice

Sitting:  Karen Angelini, Justice
Steven C. Hilbig, Justice
Marialyn Barnard, Justice

Delivered and Filed: February 10, 2010

AFFIRMED

Appellant Eulalio Hernandez[2] was charged with having committed the offense of indecency

with a child by sexual contact. The allegation relates to contact with his step-granddaughter, A.M.

---

[1] The Honorable Dick Alcala was sitting by assignment.

[2] In his brief, Hernandez refers to himself as Filiberto Morales. At trial, "Filiberto Morales" was determined to be Hernandez's real name, and the name used by his children. However, he was indicted as Eulalio Hernandez, and that is the name that appears in the trial court's judgment of conviction. Accordingly, we shall refer to appellant as "Hernandez" rather than "Morales."

A jury convicted Hernandez of the charged offense. After finding Hernandez was a repeat offender, thereby enhancing his offense to a first degree felony, the trial court sentenced him to nine years in prison. Hernandez raises one issue on appeal, arguing the trial court erred in failing to grant his motion to dismiss because he was denied his right to a speedy trial. We affirm.

### BACKGROUND

A rendition of the facts underlying Hernandez's conviction are unnecessary to the disposition of the appeal. We need only discuss the factual and procedural background as it relates to Hernandez's speedy trial issue.

On February 12, 2003, Hernandez was indicted, and a warrant issued for his arrest. The indictment alleged Hernandez had engaged in improper sexual contact with A.M., who the evidence established was his granddaughter by virtue of his marriage to F.M. Within two days of the indictment, the warrant for his arrest was entered into the National Criminal Information Center ("NCIC") and the Texas Criminal Information Center ("TCIC").[3] On March 17, 2003, officers from the Bexar County Sheriff's Office attempted to execute an arrest warrant for Hernandez at the home of his ex-wife, F.M. She informed the officers that she and Hernandez divorced in 1998, and he no longer lived with her. She also told them that Hernandez went by the name "Filiberto Morales." Hernandez was ultimately arrested on June 23, 2008, at 8415 Hidden Bow, San Antonio, Texas, the home of the woman he was living with. This was more than five years after the indictment and issuance of the original arrest warrant. The record does not contain any explanation as to how authorities learned Hernandez could be found at the Hidden Bow address.

---

[3] NCIC, which is under the control of the FBI, is a computer matching system that contains criminal histories and other information. TCIC is the Texas version of the system.

At the hearing on Hernandez's motion to dismiss, the State presented the following evidence. In March 2008, an investigator with the District Attorney's office began a search for Hernandez.[4] The investigator discovered Hernandez used three different names: Eulalio Hernandez, Filiberto Morales, and Filivario Morales. The investigator also discovered Hernandez used multiple middle names, two different social security numbers, and two different dates of birth. The investigator, using both social security numbers, searched a database run by the Texas Workforce Commission in conjunction with the IRS. Neither social security number provided any employment information for Hernandez in the last several years. The only address in the system for Hernandez was that of his ex-wife. The investigator also searched to see if Hernandez had updated his driver's license; he had not. The investigator checked records from justice of the peace courts and city traffic ticket records, but there was nothing on Hernandez. When he searched NCIC and TCIC, there were no records showing any arrest of Hernandez between 2003 and 2008, until his arrest for the instant offense.

The State also called the victim's mother, Donna Supulver, who testified her mother, F.M., was married to Hernandez for three or four years. Supulver stated she referred to Hernandez as "Filly." Hernandez moved out of her mother's home at 6835 Spring Garden in 1998. According to Supulver, Hernandez assaulted F.M., who then obtained a protective order requiring Hernandez to leave the house and stay away from her. Supulver testified that after Hernandez left her mother's house, she never saw nor heard from him again. It was not until 2001 that her daughter, A.M., told her about the alleged sexual contact with Hernandez. Supulver testified that at the time of the outcry,

---

[4] The testimony from the investigator is that he began his investigation in 2009. We believe the investigator misspoke when he used the 2009 date given it is undisputed that Hernandez was arrested in 2008.

nobody knew where Hernandez was living. On cross-examination, Supulver acknowledged that the protective order was taken against Filiberto Morales.

Hernandez called four witnesses at the hearing, including himself, his granddaughter, his daughter, and his son. Hernandez testified he learned about the charge against him the day he was arrested, but claimed that if he had known about them, he would have turned himself into authorities. He vigorously disputes the charges, alleging that his ex-wife, F.M. told him that A.M.'s father was sexually inappropriate with A.M., and was now in a mental hospital. He testified that he and his family have been unable to find F.M. so she can testify on his behalf, hurting any possible defense in the case. Hernandez also claimed that his memory has faded since the time of the alleged offense.

Hernandez admitted that his "true and correct name" is Filiberto Morales, but he has also used the name Eulalio Hernandez, and admitted being arrested under both names in the past. He testified he was arrested at the home of the woman with whom he resided, a woman who passed away while Hernandez was in jail. Hernandez said his girlfriend's home was approximately four or five blocks from 5951 Mariner, the home of his daughter Blanca Estella Morales Sanchez. Although Hernandez lived with his girlfriend at the Hidden Bow address, he received his social security check and his SSI at his daughter's home. He said the Mariner address is listed on his Texas identification and his immigration card.

On cross-examination, Hernandez testified that after leaving his ex-wife's home on Spring Garden, he moved in with one of his daughters located on Sky Harbor in San Antonio. After that daughter died, he began living with his girlfriend, and they ultimately resided at the Hidden Bow address where he was arrested. Hernandez admitted that in 1985 he went to prison after his

conviction for the offense of indecency with a child, but failed to register as a sex offender as required. He also admitted that he did not know if his ex-wife, F.M., was alive or dead.

Hernandez then called his granddaughter, Jazell Sanchez, who lives at the Mariner address. She testified that in June 2008, the police came to the house and asked if she knew a person by the name of Eulalio Hernandez. She told the police that she did not, but when they showed her a picture of Hernandez, she recognized him as her grandfather, known to her as Filiberto Morales. Jazell did not know the address where her grandfather was staying, but told officers he lived "behind a Valero gas station." On cross-examination, Jazell testified her grandfather did not live at the Mariner house, but had lived with them at one time for approximately three years.

The next witness called by Hernandez was his daughter, Blanca Estella Morales Sanchez, who lived at the Mariner address. Blanca testified that Hernandez, known to her as Filiberto Morales, had used her address for his permanent mailing address for eight to ten years. She stated her father receives Medicaid cards, social security checks, disability checks, and insurance cards. Blanca identified several exhibits as copies of Medicaid cards, a social security card, and social security checks in the name of Filiberto Morales, listing his address as 5951 Mariner. She testified the cards and checks were examples of cards he had received over the years at her home. Blanca also stated that her father visited her home on a daily basis, even though he had resided with his girlfriend for approximately eight years. She testified that if the police had come to her house in 2003, she would have cooperated and told them her father was living with her at that time.

As to her father's living arrangements over the years, Blanca stated that after he left F.M.'s home, he went to live with her sister on Old Sky Harbor. She said Hernandez lived there for six to eight months until the sister died. After the death of Blanca's sister, Hernandez came to live with

Blanca at the Mariner address, and lived there for three or four years, until he moved in with his girlfriend. Blanca said he lived with his girlfriend for approximately six to eight years, until his arrest in 2008, but she was unable to provide the address.

The last witness to testify on behalf of Hernandez was his son, Ruben Morales. Ruben testified that he had spoken to F.M. in the past and based on that conversation determined she was a vital witness for his father's defense. However, when he went to F.M.'s home, he learned she no longer lived there and no one there knew her. Ruben has sought help from attorney friends in his attempt to find F.M., but to no avail.

After considering the evidence presented at the hearing on Hernandez's motion to dismiss, the trial court denied the motion. The jury convicted him of the charged offense. Hernandez then perfected this appeal, and in a single issue challenges the trial court's decision to overrule his motion to dismiss based on an alleged violation of his right to a speedy trial.

## DISCUSSION

### *Applicable Law*

Under the Sixth Amendment to the United States Constitution, an accused is guaranteed the right to a speedy trial.[5] *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). The right to a speedy trial attaches once a person becomes an "accused," i.e., once he is arrested or charged. *Id.* We analyze speedy trial claims "on an ad hoc basis" by weighing and then balancing the four factors espoused by the Supreme Court in *Barker v. Wingo*: (1) the length of the delay, (2) the reason for the

---

[5] Article I, section 10 of the Texas Constitution also guarantees the accused in all criminal prosecutions the right to a speedy trial. TEX. CONST. art. I, § 10. The right under the Texas Constitution is independent of the right guaranteed by the Sixth Amendment, but the court of criminal appeals has held that courts are to analyze claims of a denial of the state right using the same analysis as that used for an alleged violation of the federal right. *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992).

delay, (3) the assertion of the right, and (4) the prejudice to the accused. *Id.*; *see Barker v. Wingo*, 407 U.S. 514, 530 (1972).

The State has the burden to justify the length of the delay, but the defendant must prove assertion of the right and show prejudice. The defendant's burden "varies inversely" with the State's degree of culpability for the delay. *Cantu*, 253 S.W.3d at 281 (quoting *Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993)). "Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial." *Cantu*, 253 S.W.3d at 280-81.

The *Barker* analysis is activated once there is a delay that is sufficiently unreasonable as to be "presumptively prejudicial." *Id.* at 281 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)). The court of criminal appeals has held that although there is no set time limit that triggers the *Barker* test, a delay of four months is not sufficient, but a delay of seventeen months is sufficient. *Cantu*, 253 S.W.3d at 281 (citing *Pete v. State*, 501 S.W.2d 683, 687 (Tex. Crim. App. 1973) (holding four-month delay is not presumptively prejudicial); *Phillips v. State*, 650 S.W.2d 396, 399 (Tex. Crim. App. 1983) (holding seventeen-month delay is presumptively prejudicial)). Once *Barker* is invoked by a presumptively prejudicial delay, courts must analyze the speedy trial claim by first weighing the strength of each remaining factor, and then balancing their relative weights in light of "the conduct of both the prosecution and the defendant." *Cantu*, 253 S.W.3d at 281 (quoting *Barker*, 407 U.S. at 530). No one factor is either necessary or sufficient to find a speedy trial violation; rather, the factors are related and must be considered together along with any other relevant circumstances. *Cantu*, 253 S.W.3d at 281. Accordingly, "courts must engage 'in a difficult and sensitive balancing process' in each individual case." *Id.* (quoting *Barker*, 407 U.S. at 533).

Dismissal of the indictment or complaint is mandated only if the court finds the accused's right to a speedy trial was actually violated. *Cantu*, 253 S.W.3d at 281. Dismissal is a radical remedy, and therefore applying the *Barker* test woodenly, without "common sense and sensitivity" to ensure charges are dismissed only when the evidence shows an actual, asserted speedy trial violation, would run afoul of society's interest in trying those accused of crimes rather than granting them a pass because of a legal error. *Id.* The right of the accused is to a speedy trial, not a dismissal of the charges against him. *Id.*

### *Standard of Review*

In reviewing a trial court's ruling on a speedy trial claim, we apply a bifurcated standard of review: abuse of discretion for factual components, and a de novo standard for legal components. *Id.* at 282. "Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but "[t]he balancing test as a whole . . . is a purely legal question." *Id.* (quoting *Zamorano v. State*, 84 S.W.3d 643, 648 n.19 (Tex. Crim. App. 2002)).

When using the abuse of discretion standard, appellate courts must defer not only to a trial court's resolution of disputed facts, but to its right to draw reasonable inferences therefrom. *Cantu*, 283 S.W.3d at 282. When assessing the evidence at a speedy trial hearing, the trial court may wholly disregard a witness's testimony, even if uncontroverted. *Id.* The trial court is in the best position to make credibility and demeanor evaluations with regard to witnesses. *See id.* The trial court is also entitled to disbelieve any evidence as long as there is a reasonable and articulable basis to do so. *Id.* Appellate courts must view the evidence in the light most favorable to the trial court's ruling. *Id.*

Because Hernandez lost in the trial court on his speedy trial claim, we presume the trial court resolved any disputed fact issues in the State's favor, and we defer to the implied findings of fact supported by the record. *Id.*

### *Application*

#### *Length of Delay*

The State concedes the delay in this case, which is measured from the date the defendant is formally accused or arrested, is presumptively prejudicial so as to trigger the *Barker* analysis. *See Emery v. State*, 881 S.W.2d 702, 708 (Tex. Crim. App. 1994) (citing *United States v. Marion*, 404 U.S. 307, 313 (1971)). We agree. Hernandez was indicted on February 12, 2003, and his motion to dismiss was heard, and trial began, on March 23, 2009, a delay of a little more than six years, far longer than the seventeen month delay found presumptively prejudicial by the court of criminal appeals. *See Phillips*, 650 S.W.2d at 399. Because the delay stretched well beyond the minimum needed to trigger the *Barker* inquiry, this factor weighs heavily against the State. *Zamorano*, 84 S.W.3d at 649.

#### *Reason for Delay*

Once the court determines a presumptively prejudicial delay has occurred, the State has the burden to justify the delay. *Emery*, 881 S.W.2d at 708.

> A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reasons such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant . . . [but] a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531. If the record is silent as to the cause for the delay, we presume no valid reason for the delay exists. *Phillips*, 650 S.W.2d at 400 (citing *Turner v. State*, 545 S.W.2d 133, 137-38 (Tex. Crim. App. 1976)); *State v. Rangel*, 980 S.W.2d 840, 844 (Tex. App.—San Antonio 1998, no pet.).

In explaining the delay, the State presented evidence from an investigator with the District Attorney's office who testified as to the steps he took in an effort to locate Hernandez. The investigator described that his search revealed multiple names, dates of birth, and social security numbers for Hernandez. This evidence might have justified the delay; however, the investigator admitted he was not asked to begin a search for Hernandez until 2008, five years after Hernandez was indicted. The investigator's testimony provides no support for the delay from the time of the indictment in 2003 to the time in 2008 when he was asked to search for Hernandez.

The other evidence in the record shows that after the indictment, the police made a single attempt in 2003 to find and arrest Hernandez. Officers went to the home where they believed Hernandez lived, but it turned out to be the home of his ex-wife, who informed officers of Hernandez's true name, Filiberto Morales, and advised them he no longer lived with her. There is absolutely no evidence in the record of any steps taken by the authorities to locate or arrest Hernandez until five years later. The record is completely silent as to the reason for this five-year delay. Accordingly, we presume there was no valid reason for the delay. *See id.*

<u>Assertion of Right to Speedy Trial</u>

The inherent nature of the right to a speedy trial makes "it impossible to pinpoint a precise time in the process when the right must be asserted or waived." *Cantu*, 253 S.W.3d at 282 (quoting *Barker*, 407 U.S. at 527). This does not mean, however, that the burden of protecting the right

should be placed solely on the defendant. *Cantu*, 253 S.W.3d at 282. The State has the duty to bring the defendant to trial; the defendant bears no burden to bring himself to trial. *Id.* Nevertheless, the defendant does have the responsibility to assert his right to a speedy trial. *Id.* "Whether and how" he does this is closely tied to the other *Barker* factors because "the strength of his effort will be shaped by them." *Id.* at 282-83. If there is a serious deprivation of the speedy trial right, it is more likely that the defendant will complain. *Id.* at 283. Accordingly the defendant's assertion or failure to assert his right to a speedy trial is given strong evidentiary weight in determining whether a deprivation occurred. *Id.*

If the defendant files a motion seeking dismissal rather than a speedy trial, his speedy trial claim is weakened because it shows the defendant desires no trial instead of a speedy trial. *Id.* If the defendant seeks dismissal without having first sought a speedy trial, he must provide persuasive reasons for doing so. *Id.* Repeated requests for a speedy trial weighs heavily in the defendant's favor, but a failure to request a speedy trial "supports an inference that the defendant does not really want a trial, he wants only a dismissal." *Id.*

Although Hernandez was indicted and a warrant was issued for his arrest in 2003, there is nothing in the record to establish that Hernandez knew about the indictment or warrant until his actual arrest on June 23, 2008. Almost immediately after his arrest, Hernandez brought the speedy trial issue forward by motion filed July 9, 2008, but the relief sought in the motion was not for a speedy trial, but for a dismissal of the charges. This weakens Hernandez's claim. *See id.* Moreover, while Hernandez filed his motion almost immediately, it was more than eight months before he actually asserted the right by obtaining a hearing, and this was on March 23, 2009, the very day trial was to begin. There is nothing in the record to establish Hernandez took any steps to set his speedy

trial motion until the day of trial. Finally, because Hernandez sought only dismissal without an actual request for a speedy trial, he was required to provide cogent reasons for this choice. *See id.* Hernandez provided no reasons, persuasive or otherwise, for seeking a dismissal without first having sought a speedy trial, or for failing to press the issue for more than eight months after the motion was filed. Accordingly, the "assertion" factor weighs against Hernandez.

*Prejudice*

Pretrial delay is generally "inevitable and wholly justifiable." *Id.* at 285 (quoting *Doggett*, 505 U.S. at 656). Therefore, the court must examine whether and to what extent the delay has prejudiced the defendant. *Cantu*, 253 S.W.3d at 285. When analyzing the prejudice to the defendant, the court must do so in light of the interests the right to a speedy trial was designed to protect: (1) freedom from oppressive pretrial incarceration, (2) mitigation of the anxiety and concern accompanying public accusation, and (3) avoidance of impairment to the accused's defense. *Id.* Of these interests, the last is the most serious because a defendant's inability to prepare his defense affects the fairness of the entire system. *Id.* A defendant is not required to show actual prejudice of the protected interests; rather, he need only make some showing that he has been prejudiced by the delay. *Rangel*, 980 S.W.2d at 844 (citing *State v. Burckhardt*, 952 S.W.2d 100, 104 (Tex. App.—San Antonio 1997, no pet.).

Hernandez was incarcerated after his arrest, and was denied bond. The denial of bond was based on an immigration hold placed on Hernandez by federal authorities. Hernandez testified he was unaware of the immigration hold, and was confused by it because he claims he is a legal resident. In total, Hernandez spent nine months in jail from the time of his arrest until trial. However, Hernandez admitted that he did not work, so he did not lose a job as a result of his

incarceration, nor did he lose any income because he continued to receive his social security checks, which were deposited by his son on his behalf. Although Hernandez's incarceration resulted in a physical separation from family members, and feelings of sadness regarding his arrest and its impact on his now deceased girlfriend, he did not suffer disruption in employment or draining of financial resources–two of the factually "major evils protected against by the speedy trial guarantee." *See United States v. Marion*, 404 U.S. 307, 320 (1971). Any prejudice suffered by Hernandez as a result of his nine-month pretrial incarceration was slight.

Hernandez's testimony regarding the anxiety he suffered was brief and generalized. First, by his own admission, Hernandez was completely unaware of the charges against him until his arrest – so for five years, neither he, his associates, nor his family suffered any anxiety or humiliation as a result of the charges brought against him. When asked at the speedy trial hearing how he felt about the pending charges, Hernandez's testimony was much like that of anyone who had been charged with such an odious offense. Hernandez stated he "felt bad," "sad," and "destroyed." Although general anxiety "is at least some evidence of the type of 'anxiety' that the Supreme Court considers under the prejudice prong of *Barker*[,]" evidence of generalized anxiety is not sufficient proof of prejudice under *Barker*. *Cantu*, 253 S.W.3d at 286-87. This is especially true when the asserted anxiety is no greater than that which would normally occur as the result of a criminal charge or investigation. *Id.* at 287. Given Hernandez's testimony, we find the anxiety he suffered insufficient to establish prejudice.

Finally, Hernandez and his son testified regarding alleged impairment to his defense based on the passage of time. There was testimony that Hernandez's memory has faded due to the passage of time, as well as surgery to remove a brain tumor. However, the State's witnesses are subject to

the same detriment with regard to fading memories based on the passage of time. And, as for his surgery, Hernandez's son testified that the surgery took place in the 1980s, and thus this "cause" for memory loss would have been present even if Hernandez had been arrested when the warrant was first issued in 2003.

Hernandez also testified that his defense was compromised because as result of his incarceration and the passage of time, he had been unable to locate a vital witness – his ex-wife, F.M. He testified F.M. had admitted to him that A.M. had been sexually abused by her father, and as a result, the father had been placed in a mental institution. Hernandez's son attempted to bolster this testimony by stating that he too had a conversation with F.M. and what he learned as a result of the conversation was vital to his father's defense; the trial court prohibited the son from testifying to what he was told by F.M.

Assuming F.M. would have testified on behalf of the ex-husband against whom she obtained a protective order, and who allegedly molested her granddaughter, we find Hernandez's evidence of what F.M.'s testimony would have been fails to establish prejudice based on impairment to his defense. First, Hernandez did not provide any time frame in which F.M. allegedly told him about the father's sexual assault of A.M. Second, and most importantly, testimony that A.M. was abused by a second individual does not prove she was not abused by anyone else, specifically Hernandez. Any prejudice from Hernandez's failure to locate F.M. was slight at best.

## CONCLUSION

After weighing and balancing the *Barker* factors in light of the evidence presented, we hold the trial court did not abuse its discretion in denying Hernandez's motion to dismiss based on speedy trial grounds. Though the State's absence of reasons for delay weighs against it, from this record,

one could conclude Hernandez wanted only a dismissal of the charge against him, not a speedy trial, given that he only sought dismissal and he waited until the day of trial to actually assert his motion, and any personal or defense prejudice resulting from the delay was slight. Accordingly, Hernandez was not denied his Sixth Amendment right to a speedy trial, and we affirm the trial court's judgment.

Marialyn Barnard, Justice

Do Not Publish